Joel J. Tyler, J.
We are again thrust into the over explored thicket of obscenity law. The defendant is charged with promotion, or possession with intent to promote* obscene material, knowing the contents and character thereof, all in violation of subdivision 1 of section 235.05 of the Penal Law, a class A misdemeanor.[1] It was tried before the court without a jury.[2]
*750 "What is involved is the showing in-a public theatre, at a $5 per admission charge, of the film “Deep 'fhroat ’ The case has engendered some public interest here and elsewhere. However, it is not unique. Many cases dealing with depiction of the same or similar deviate sexual behavior have been reported, but few have had such a full measure of directed publicity.
The Film
The film runs 62 minutes. It is in color and in sound, .and boasts a musical score. Following the first .'innocuous scene (“ heroine ’’driving a car), the film runs from one act of explicit sex into another, forthrightly demonstrating heterosexual intercourse'and a variety of deviate sexual acts, not “ fragmentary and fleeting ” as to be de minimis as in Jacobellis v. Ohio (378 U..S. 184,197-198 [1964], Goldbebg,'J.); or 10 minutes out of a 120-ininute movie as in “I Am Curious-Yellow” (404 F.. 2d 196, 203, infra)'- but here it. permeates and engulfs-the film from beginning to end. The camera angle, emphasis and close-up zooms were directed, as in United States v. Kaehler (12 Cr. L. Rptr. 2383, 2384 [Feb. 7, 1973]), “ toward a maximum exposure in detail of the genitalia ” during the gymnastics, gyrations, bobbing, trundling, surging, ebb, and/flowing, eddying, moaning, groaning and sighing, all with ebullience and gusto.
There were so many and varied forms of sexual activity one would tend to lose count of them. However, the news reporters were more adept and counted seven separate acts of fellatio and four of cunnilingus (Newsweek, Jan. 15, 1973, p. 50; New York Times Mag. Sec., Jan. 31, 1973, p. 28). Such concentration upon the acts of fellatio and cunnilingus overlooked the numerous clear,. clinical acts of sexual intercourse, anal sodomy, femále masturbation, clear depiction of seminal fluid ejaculation and an orgy scene — a Sodom and Gomorrah gone wild before the fire— all of which is enlivened with the now famous “four letter words ” and finally with bells ringing and rockets bursting in climactic ecstacy.
The performance of . one sexual act runs almost headlong into the other. One defense witness thought 75% to 80% of the film involved depiction of explicit sexual activity and another viewed it at over 50%. A timekeeper may have clocked a higher percentage. Nothing was faked or simulated; it was as explicit and as exquisite .as life. . One defense witness said he saw “ realism and genuine sexual experience.” No imagination was needed, since it was intended, to appeal to the imbecile as well.
The defense expert witnesses testified that the film possessed entertainment value and humor. The court in People ex rel. *751 Hicks v. “ Sarong Gals ” (27 Cal. App. 3d 46, 51 [1972]) appropriately answered that tedious and tenuous argument, often but conscientiously made in obscenity cases which have nothing to redeem them: ‘ ‘ Presumably, the Romans of the First Century derived entertainment from witnessing Christians being devoured by lions. Given the right audience, the spectacle of a man committing an act of sodomy on another man would provide entertainment value. However, neither this spectacle nor the activities described in the instant case are invested with constitutionally protected values merely because they entertain viewers. However chaotic the law may be in this field, no court has yet adopted such an extreme result.”
In passing, it should be noted that the defense “ expert ” witnesses were unpersuasive in the main. For example, a defense psychologist testified that he would use films like ‘ ‘ Deep Throat ” as classroom sex educational material not only in colleges but for certain high school students as well.
The alleged “ humor ” of the film is sick, and designed on a level to appeal especially to those first learning that boys and girls are different. Drama critic Vincent Canby characterizes the jokes as “ dumb gags [which] cannot disguise the straight porno intent.”[3] This, the defense, experts here maintain, helps redeem the film as worthwhile. As to plot, there is none, unless you exclude the sexual activity which is the sole plot. And as to character development, a desirable and necessary concomitant of meaningful film, stage or book, again there is none, unless, of course, one means that the progression (or retrogression) of multiple and varied nymphomania to a singular form (fellatio) is evidence of this attribute.
Oh, yes! There is a gossamer of a story line — the heroine’s all-engrossing search for sexual gratification, and when all sexual endeavors fail to gratify, her unique problem is successfully diagnosed to exist in her throat. She then seeks to fill the doctor’s prescription by repeated episodes of fellatio, which Nora Ephron euphemistically characterizes as “ compensatory behavior” (Esquire, Feb., 1973).
The defense experts testified that they see the film legitimatizing woman’s need and “ life right ” (as one put it), for sexual gratification, equal- with that of men. They also see in the film the thoughtful lesson that sex 'should not be unavailingly mono *752 lithic (usual face-to-face relationship)[4], but should take varied forms, with complete sexual gratification as the crowning goal, or as the film seems to advertise in its plebeian fashion— “ different strokes for different folks or as others, less articulate, might say, “ there’s more than one way to skin the cat.” These unusual and startling revelations are of social value, they say, not only for the bedroom, but necessary as an object lesson for a public forum.
The alleged story lines are the facade, the sheer negligee through which clearly shines the producer’s and the defendant’s true and only purpose, that is, the presentation of unmistakably hard:core pornography, where “ imágination has gone to work in the porno-vineyards” — a quotation by a newsman, and adopted by the defendant in its newspaper advertisements. One defense expert actually but unwittingly, confirms the charade when he says that the “ plot ” of the film “ provides a thread on which the various sequence of sexual acts would be hung.”
Movie critic Judith Crist characterizes the production “ idiot moviemaking” and the actors “awful” (New York Magazine, Feb. 5, 1973, p. 64). I agree, except to add that a female who would readily and with apparent, anxious abandon, submit to the insertion of a glass dildoe container into her vagina, have liquid poured therein and then drink it by means of a tube, as was done here to and by the “ superstar ”, is not a reflection merely upon her thespian ability, but a clinical example of extraordinary perversion, degeneracy and possible amentia.[5] Whatever talent superstar has seems confined to her inagnificent appetite and sword-swallowing faculty for fellatio.
In this court’s view, the film and its genre have a significant meaning and impact, transcending this case, for all society (including for those who have seen the movie), as noted in tfie Appendix, attached hereto.
The Law
Section 235.05 of the Penal Law, and particularly the definition of “ obscene ” in subdivision 1 of section 235.00, represent the New York Legislature’s attempt to codify the Federal *753 rules first enunciated in Roth v. United States (354 U. S. 476, 489 [1957]), reiterated in Jacobellis v. Ohio (378 U. S. 184 [1964]), which also equated “ contemporary community standards ’ ’ with ‘‘ national ’ ’ rather than any local standards; and elaborated and summarized in Memoirs v. Massachusetts (383 U. S. 413, 418-419 [1966]), (involving the famous “Fanny Hill ” book; and, hereinafter, referred to merely as Memoirs); and further elaborated by Redrup v. New York (386 U. S. 767 [1967]). (See McKinney’s Cons. Laws of N. Y., Practice Commentary, Book 39, Penal Law, p. 89.)
The determination of obscenity involves the “ independent ” application of three separate tests, all of which must “ coalesce ” and be directed to the “ average person.” According to the Both-Memoirs test, material may be deemed obscene if: (a) the dominant theme of the material taken as a whole appeals to prurient interest in sex; (b) it is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters, and (c) the material is utterly without redeeming social value.[6]
The tests were adjusted as they apply to sexual deviants by Mishkin v. New York (383 U. S. 502 [1966]), and given a different dimension in “close” cases, where “ pandering ”, if found, will move such a case over the brink into the pool of obscenity (Ginzburg v. United States, 383 U. S. 463 [1966]), as would the finding of any one of the three added tests in Bedrup (386 U. S. 767, supra); People v. Stabile (58 Misc 2d 905); Shinall v. Worrell (319 F. Supp. 485 [1970]).
Clearly, this case does not involve admission to the theatre of minors (Penal Law, §§ 235.20, 235.21; Jacobellis v. Ohio, 378 U. S. 184, 195, supra). Nor is there evidence that the film, in some manner, has been foisted upon an unwilling public or individual, in violation of his right to privacy (Redrup, supra). Nor is there, nor could there be a claim by defendant of lack of scienter. (Smith v. California, 361 U. S. 147 [1959].)
There is a claim, however, that the film here was pandered in violation of the criterion of Ginzburg (supra), in that the newspaper ads evidenced an intent to commercially exploit the film for the sake of its prurient appeal, and should be condemned for this among other reasons. There is evidence of pandering here. However, Ginzburg is applicable only in “ close ” cases; and “ Deep Throat” is far from a close case; it is a classic case; and, therefore, we need not rely on this prohibition to *754 legally sanction it. Furthermore, although; the advertisements placed in evidence, speak of the film as “ The very best porn film ever made ” and “ Imagination has gone to work in the porno-vineyards and courts should “ accept [the purveyor’s] evaluation at its face value ” (Memoirs, 383 U. S. 413, 420, supra), we do not equate that chest thumping with the circumstances of presentation and dissemination condemned in Ginzburg. There is no reason to dwell on this comparatively tenuous element, when there is so much more in the “vineyards ” of this film, offering a direct and clear basis for legál sanction. Accordingly, let us consider: Is the film obscene under the law?
Admittedly, the “ guidelines ” of Roth-Mem'oirs are distressingly ambiguous. But some would maintain there is merit in ambiguity, to meet the shifts of society’s national values and moral imperatives. ‘ ‘ The criminal law which deals with imperfect humanity cannot await the perfect definition — nor the perfect society in which, perhaps, no definitions would be necessary.” (Hofstadter and Levittan, “ No Glory, No Beauty, No Stars — Just Mud”, 37 N.Y.S.B.J., 38). We embark to apply the tests to the film, with no trepidations or uncertainty in this particular case.
We begin with the premise, well-established, that motion pictures, as other forms of communication, are equally entitled to constitutional protection under the First -Amendment. (Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495 [1952]; Kupferman and O’Brien, “ Motion Picture Censorship — The Memphis Blues ”, 36 Cornell L. Rev. 273, 288 [1951].) And they are protected against State abridgement by the Fourteenth Amendment. (Gitlow v. New York, 268 U. S. 652 [1925]; Thomas v. Collins, 323 U. S. 516 [1945].)
Motion pictures are understood to encompass problems peculiar to that form of expression, not subject to the precise rules governing other communication media. Accordingly, the Constitution does not require “ absolute freedom to exhibit every motion picture of every kind at all times and all places.” (Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495, 502, supra; Matter of Trans-Lux Distr. Corp. v. Board of Regents, 14 N Y 2d 88, 92 [1964], revd. on other grounds 380 U. S. 259).
We have here a film and not a novel, book or magazine, and this, we believe, adds a different and significant dimension to the question. Stanley Kaufman notes (22IThe Public Interest, p. 31, Winter 1971) a discernible difference in the one-to-one relationship of writer and reader ‘ ‘ in psychic and social *755 senses,” from the employment of people to enact sexual fantasies on stage and screen before an audience. The stark reality and impact of a movie is undeniably as impressive .as the viewing of a true-life situation on the open street. Certainly, to read descriptions of explicit sexual activity as shown in “ Deep Throat ”, or merely to . hear them discussed, can never have, that same poignancy and cannot create that same lasting impression upon the human mind or appeal to the prurient as does the observation of the acts in a true life situation or on the screen. (Freedman v. Maryland, 380 U. S. 51, 61 [1965]; United States v. A Motion Picture Film Entitled “ I Am Curious-Yellow ”, 404 F. 2d 196, 203 [1968]; United States v. A Motion Picture Film Entitled “ Pattern of Evil,” 304 F. Supp. 197, 202 [1969]; People v. Bercowitz, 61 Misc 2d 974, 981-983 [1970].)
Because of a fihn’s/unique, shocking quality, we cannot disregard its potent visual"impact in depicting, as does “Deep Throat ”, the fellatio, cunnilingus, masturbation, sexual intercourse, and other sexual activity.. Such depictions of clearly discernible acts ‘ ‘ transcend the bounds of the constitutional guarantee long before a frank description of the same scenes in the written word. ’ ’ (Landau v. Fording, 245 Cal. App. 2d 820, 823, affd. 388 U. S. 456 [1967], rehearing den. 389 U. S. 889). Accordingly, the appeal to prurience, the recognition of patent offensiveness, the violation of community standards and absence of social value will be réalized more readily and more assuredly with a film than in a writing.
' This difference seems to have motivated the Supreme Court in its almost consistent refusal to reject as obscene the written word, such as those in “Tropic of Cancer” (Grove Press v. Gerstein, 378 U. S. 577 [1964] and “ Fanny Hill ” (Memoirs, 383 U. S. 413, supra). Since Redrup v. New York (386 U. S. 767, supra), the Supreme Court, in seven cases, overruled obscenity convictions involving the publication of novels.[7] As a result, the court in State of Minnesota v. Carlson (202 N. W. 2d 640, 645 [Sup. Ct. of Minn., 1972], concludes —“ Apparently the rulings demonstrate that the printed word, no matter how . tawdry, is not, obscene. ’ ’
*756 It is Habd-cobe Pobbtügbaphy.
Hard-core pornography ivas the sole class of material declared impermissible, prior to the adoption of section 235.05 of the Penal Law. (People v. Richmond County News, 9 N Y 2d 578, 586 [1961]; People v. Weingarten, 25 N Y 2d 639 [1969].) However, in Mishkin v. New York (383 U. S. 502, 506, supra), the court explained that RothJMemoirs criteria expanded the test to include additional classes of material within legal restraint, and apparently, hard-core now remains but one of many conceivable illegalities. (Redrup v. New York, supra.)
This court has previously indicated the substantial evidence pointing to the reality that the Supreme Court in Roth (354 U. S. 476, supra), and since then, has equated obscenity with hard-core pornography, without expressly saying so, and that Redrup lends additional support to the view that that court will limit its condemnations to hard-core only. (People v. Kirkpatrick, 64 Misc 2d 1055, 1077-1079 [1970], affd. 69 Misc 2d 212.) In the light of the present position of our forever modulating social standards, it is not farfetched to predict that our high court will eventually and, in fact, expressly say so: It would make more sense than the manifold rules of Roth-Memoirs. In fact, at least one jurist apparently believes that the court has already taken this position, when he concludes “ that the definition of obscenity contained in section 235.00 of the Penal Law and ‘ hard-core ’ pornography are synonymous, and it is only this 1 clearly identifiable class of material * * * > which is proscribed in New York. ’ ’ (People v. Druss, N. Y. L. J., Jan. 18, 1973, p. 15, col. 4.)
What is hard-core pornography and its connection with “ Deep Throat ”?
We know sex is not obscene; Roth (354 U. S. 476, 487, supra) tells us that when it says “ sex and obscenity are not synonymous ”. Now, that we know what it is not, then what is obscenity? Admittedly, “ obscenity ” almost defies meaningful definition. (Jacobellis v. Ohio, 378 U. S. 184, 199, supra, Alpert, “Judicial Censorship and Obscene Literature”, 52 Harv. L. Rev. 40, 47 [1938].) Is hard-core any more susceptible to exact delineation? Chief justice Wabbebt finds both tasks impossible, with the comment — “But who can define ‘ hard core pornography ’ with any greater clarity than ‘ obscenity ’ ” (Jacobellis, supra, p. 201)[8].
*757 But yet others find it readily definable and certainly more readily identifiable as a reasonably precise concept, which “theoretically, could unite a strong majority of the Supreme Court”, Magrath, The Obscenity Cases: Grapes of Both, 99 Sup. Ct. Bev. 1, 69 [1966].[9] My learned brother, Judge William S. Shea recently advised that ‘ ‘ Hard-core pornography is a specific type of obscenity, it is obscenity in its easiest recognizable form. It contains something more than obscenity in its general or hard to recognize form and that ‘ something ’ is its depiction of actual sexual activity including intercourse and deviate acts.” (People v. Wrench, 73 Misc 2d 434.) Also my brother, Judge Arthur Goldberg (and Yeaegiw) agree, that the decisions involving explicit sexual activity represent the distinction to “ indicate palpable lines between obscenity and protected expression. ’ ’ (People v. Bercowitz, 61 Misc 2d 974, 978 [1970]).[10] *758 The Report of the Commission on Obscenity and Pornography (New York Times Ed. 1970, pp. 22, 425) agrees that explicit sex is the distinguishing feature of hard-core pornography from other obscenity in that it demonstrates “ sexual intercourse,' depicting vaginal, anal or oral penetration.”
They are on good ground and have much support. For example: Ginzburg v. United States (383 U. S. 463, 499, supra); People v. Noroff (67 Cal. 2d 791, 794, n. 6 [1967]); Hunt v. Keriakos (428 F. 2d 606 [1970], cert. den. 400 U. S. 929); Wagonheim v. Maryland St. Bd. of Censors (255 Md. 297 [1969], affd. sub nom. Grove Press v. Maryland St. Bd. of Censors, 401 U. S. 480 [1971]); State of Wisconsin v. Amato (49 Wis. 2d 638, 645 [1971], cert. den. 404 U. S. 1063 [1972]); State of Minnesota v. Carlson (202 N. W. 2d 640, 647, supra); People v. Clark (60 Misc 2d 1073 [1969]); People v. Morgan (68 Misc 2d 667 [1971]).
The explicit sexual activity represents the “ hard-core ” feature of the material, while the “ pornography ” and its prurient appeal is distinguished by its pervasive hallucinatory quality, its ability to produce physical concomitants of* sexual. excitement and emotion (Kronhausen, Pornography and The Law, pp. 285-86, 329-301 [1969]). Such material has “the character of the daydream — the product of sheer fantasy.” (Margaret Mead, Sex and Censorship in Contemporary Society, New World Writings, p. 19 [1953]). As the Kronháusens noted, life, unlike hard-core, “seldom presents us with a succession of erotic experiences one more stimulating and exciting than the other ” (p. 328).
Because of hard-core’s ready prurient appeal it is “ patently offensive,” and its indecency speaks for itself. (Memoirs, 383 U. S. 413, supra; Womack v. United States, 294 F. 2d 204, 206 [1961], cert. den. 365 U. S. 859). It constitutes “obscenity per se ”. (Donnenberg v. State, 1 Md. App. 591, 600 [1967]; Morris v. United States, 259 A. 2d 337, 341 [D. C., 1969]) and condemnable as if res ipsa loquitur, requiring no expert testimony to explain or justify it. (United States v. Wild, 422 F. 2d 34, 36 [1969], cert. den. 402 U. S. 986; Womack v. United States, supra, p. 206; Hudson v. United States, 234 A. 2d 903, 906 [D. C., 1967]; United States v. Young, 465 F. 2d 1096, 1099 [1972]; People v. Tenga, N. Y. L. J., Dec. 21, 1972, p. 2, col. 1 [App. Term, 1st Dept.] (England permits *759 expert testimony only to explain “public good” [i.e., social value] • of the material, not “ obscene or no ” [i.e. prurient appeal, community standards, etc.] Regina v. Anderson, 1 Q.B. 304, 313 [1972]).
Since its brazenness is a direct assault upon long-held concepts of national morality and propriety, it is readily recognized throughout the nation by all those not beyond the pale. Apparently, the lay press had no trouble identifying “Deep Throat ” as unmistakable hard-core pornography. “ It scarcely could be more hard-core,” says Thomas Meehan in Saturday Review (p. 80, March, 1973). “ The film is solidly hard-core pornography.” (New York Times, Dec. 30, 1972, p. 22). It is a “ hard-core ” sex film (New York Post, Jan. 3,1973, p. 10) ; . and it is a “ hard-core porno movie ’ ’ (Time, Jan. 15,1973, p. 46).
What is the purpose and effect of hard-core pornography? Its aim is “to shock, revolt or embarrass” and brutalize (Benjamin Spoek, Decent and Indecent [1969], pp. 83-84); “ to insult sex, to do dirt on it * * * to insult the human body” and “a vital human relationship” (D. H. Lawrence, Pornography and Obscenity in Sex, Literature and Censorship, pp. 74-79. [1953]); People v. Bercowitz, 61 Misc 2d 974, 980-81, supra). I believe Mr. Justice Theodore R. Ktjpfermah of our Appellate Division would agree. As an attorney, he specialized in censorship and obscenity law. In an enlightening article to the theatrical trade on the law of obscenity (Variety, Jan. 5, 1972, p. 12) he points out that a more easily enforced standard “ is that while sex is acceptéd, pornography and obscenity will be recognized in brutalizing or insulting sex.”
The United States Supreme Court has never dealt with material so brazenly explicit as the scenes of “ Deep Throat ”, but it has dealt with some cases involving explicit sex activity in films; most, however, dealt with other varities of sexuality. For example, in Jacobellis v. Ohio (378 U. S. 184, supra), the first film case since Roth, the Supreme Court considered the film “Les Amants ” which it found legally permissible. But there the court found only one “ explicit love scene in the last reel of the film ” (p. 196), and Justice Goldberg further found it “ fragmentary and fleeting ” as to be de minimis (p. 197-198). And certainly what may have been “ explicit ” then [1964] may very well be quite different from what we have today or in “ Deep Throat ”.
In Landau v. Fording (245 Cal. App. 2d 820, 827, supra), the first case where the Supreme Court found obscenity in a film, the activity there was quite explicit, depicting two males engaged *760 in “male masturbation, fellatio, oral copulation, voyeurism, nudity, Sadism and sodomy”. It is plain such activity approached, but did not equal, the explicitness of “ Deep Throat ”. But it had no music or sound, as in “ Deep Throat ”, to sharpen the prurient appeal with grunts, sighs and other sounds of orgasmic pleasure.
The majority of the Second Circuit Court of Appeals, gave its stamp of approval to the film, “ I Am Curious-Yellow ”, in spite of its finding of “ sexual intercourse under varying circumstances, some of them quite unusual. There are scenes of oral-genital activity.” Judge Lumbabd, in his dissent, explained that “ unusual ” sexual activity, as fellatio and cunnilingus. (United States v. A Motion Picture Film Entitled “I Am Curious-Yellow ”, 404 F. 2d 196, 198, 203, supra.) But; significantly, when this film finally went to the United States Supreme Court from another jurisdiction, it affirmed the conviction of obscenity. (Wagonheim v. Maryland St. Bd. of Censors, 255 Md. 297 [1969], affd. sub nom. Grove Press v. Maryland St. Bd. of Censors, 401 U. S. 480 [1971] supra.) Convictions were also obtained in Georgia (Evans Theatre Corp. v. Slaton, 227 Ga. 377 [1971], cert. den. 404 U. S. 950); Missouri (Hoffman v. Dickenson Operating Co., 468 S. W. 2d 26); Ohio (Grove Press v. Flask, 326 F. Supp. 574, cert, filed, not perfected),
Since the pivotal decision of Redrup v. New York (386 U. S. 767, supra), sex movies were the subject of nine Per Curiam reversals by the United States Supreme Court.[11] In those cases in which the sexual activity is reported below, we find much nudity and sexual activity but nowhere do we find actual copulation or oral-genital contact. Where sexual intercourse is depicted, it is usually suggested or simulated. None of the niúe *761 movies even approximate the sexual depictions in “ Deep Throat ”,
When hard-core pornography ( and I have yet to see reported anything equal in sexual activity to “ Deep Throat ”) is clearly involved, the United States Supreme Court has affirmed a conviction, as it did in Landau, or denied certiorari, as it did in Wilhoit v. United States (279 A. 2d 505 [1971], cert. den. 404 U. S. 994; State of Wisconsin v. Amato, 49 Wis. 2d 638 [1971], cert. den. 404 U. S. 1063 [1972]). Many other courts have followed suit. For example: People v. G. I. Distrs. (20 N Y 2d 104 [1967], cert. den. 389 U. S. 905); People v. Bercowitz (61 Misc 2d 974, supra); United States v. Berger (325 F. Supp. 249 [1970]); United States v. Strand Art Theatre Corp. (325 F. Supp. 256 [1970)]; People v. Heller, 29 N Y 2d 319 [1971], cert. granted 406 U. S. 916 [pending]); Slaton v. Paris Adult Theatre I (228 Ga. 343 [1971], cert, granted 408 U. S. 921 [pending]); United States v. Young (465 F. 2d 1096 [1972]); State of Minnesota v. Lebewitz (202 N. W. 2d 648 [1972]); United States v. Kaehler (U. S. Dist. Ct., Iowa, 12 Cr. L. Rptr. 2383 [1973]).
If defendant’s counsel had submitted a posttrial brief, we are certain he would'have mentioned in his support United States v. 35 MM. Motion Picture Film Entitled “ Language of Love ” (432 F. 2d 705 [1970]).[12] However, a careful reading of that case will reveal substantive differences between it and the subject film, which the court there found justified the ruling. In “Language of Love,” the court noted, “ The explicit scenes of sexual activity consist almost exclusively of normal heterosexual relations between adults in private. Female masturbation, cunnilingus (but not fellatio * * *) and one fleeting instance of actual insertion are shown” {supra, p. 707, n. 2, emphasis supplied). “ Deep Throat ” not only has female masturbation, but numerous depictions of cunnilingus and fellatio, clear and stark, from almost its beginning to its bitter end (for the film’s major theme is fellatio); and with one disgusting scene of seminal fluid ejaculation into and about the “superstar’s” mouth. ‘ ‘ Deep Throat ’ ’ also boasts of scenes of anal sodomy, an orgy scene, and several scenes of normal heterosexual intercourse, but unlike the other film, it also shows actual insertion in each such scene with purposeful camera focusing close upon the genitals while so engaged.
*762 But the differences are not merely to be found in the number and variety of such activity. Significantly, '“ Language of Love ” was found obscene by a jury;,but that.was overturned on appeal. And on appeal the court found the described sexual acts with “ seemingly interminable ” psychological, medical and sociological discussions by doctors and other specialists recognized in their respective fields, making up almost all of the film (supra, p. 707). Further, as indicative of its sex educational purposes, the film includes a demonstration of proper placement of contraceptive devices during the course of a gynecological examination by one of the doctors (supra, p. 707). (Also: United States v. Stewart, 336 F. Supp. 299 [1971]; Haldeman v. United States, 340 F. 2d 59 [1965]). To compare then “ Deep Throat ” with that film, is not to have seen “ Deep Throat”, because in the one (“Deep Throat”) there lurks behind each elm “the leer of the sensualist ” (Ginzburg v. United States, 383 U. S. 463, 468). We do not understand our condemnation of “ Deep Throat ” as running counter to Kingsley Pictures Corp. v. Regents (360 U. S. 684 [1959]), which distinguishes the communication of any idea, however deviant from orthodoxy with “ the manner of its portrayal” (p. 688). Not only do we hold here that the manner of portrayal, in fact, appeals, and its sole purpose is to appeal, to prurient interest in sex, but we discérn no “ idea ” worthy of protection. As we stated in People v. Buckley (65 Misc 2d 917, 922 [1971], affd. 72 Misc 2d 549) “ the use of the word ‘ redeeming ’ in the social value test is a limiting factor — i.e., the social value of a publication as a whole must at least have a modicum of significance to release it from blame. In Memoirs (supra) the Supreme Court held that the social value of Cleland’s book, however small it may have been in terms of its literary merit and its depiction of the mores of a particular period, redeemed its prurient-candid sexual references. We find no such qualitative redemption” the court held there as to the publication it was considering., And I find no such qualitative redemption in “ Deep Throat ” either.
Defendant asks us to be guided by the jury in Binghamton, New York, which acquitted another corporate defendant of the charge of obscenity, involving this film. Counsel appears to urge that surely a jury is far more receptive and attuned to what material does or does not affront community standards, than would a cloistered Judge. An examination of the certified minutes, announcing the verdict in that case, gives reason to *763 believe that the jury there had possibly a different view of the film than the verdict would imply.[13]
Of course, it is academic that a jury’s role stops at the determination of the fact situation. But the determination of obscenity transcends merely fact finding; it is intimately admixed with the determination of constitutional law and that decision is solely for a court, which may not permit the usurpation of that function by a jury. Necessarily, in the determination of the constitutional imperatives, the court must make assessments of the dominant theme, prurient interest, national community standards, redeeming social value and the like. (Roth v. United States, 354 U. S. 476, 497-98, supra; Jacobellis v. Ohio, 378 U. S. 184, 190, supra; Memoirs, 383 U. S. 413, 450, 462, supra; United States v. 35 MM. Motion Picture Film Entitled “ Language of Love ”, 432 F. 2d 705, 709-711, supra; People v. Kirkpatrick, 64 Misc 2d 1055, 1072, supra.) For this reason courts do, when justified, overturn jury verdicts in this area of law. (United States v. 35 MM. Motion Picture Film Entitled “ Language of Love ”, supra; United States v. A Motion Picture Film Entitled “ I Am Curious-Yellow ”, 404 F. 2d 196, supra.)
*764 WHEN ALL IS SAID
“Deep Throat ”— a nadir of decadence — is indisputably obscene by any legal measurement, and particularly violative of .section 235.05 of the Penal Law.
It goes substantially beyond ‘ ‘ the present critical point in the compromise between candor and shame at which the [national] community may have arrived here and now.” (United States v. Kennerley, 209 F. 119, 121 [1913]). It is another manifestation of the refusal to use words as emotional symbols unrelated to the purely physical. There is no effort, by word or conduct, to cut through the imponderable barriers of human understanding to the defense of human integrity. It, in fact, denigrates that integrity of man and particularly, woman, the expert witnesses, notwithstanding. It does this by objectifying and insulting woman, as Anthony Burgess, the author, puts it, by ‘1 making woman the sexual instrument come before woman the human being.” (New York Times Book Review, Jan. 2, 1972, p. 1). Thus it supports the misogynist’s view.
Its dominant theme, and in fact, its only theme is to appeal to prurience in sex. It is hard-core pornography with a vengeance. “ It creates an abstract paradise in which the only emotion is lust and the only event orgasm and the only inhabitants animated phalluses and vulvae.” (Anthony Burgess, supra, speaking of pornography generally, supra, and well applied here). It is neither redeemed nor redeemable, lest it be by the good camera work, editing, clarity, good color and lack of grain, which defense witness, a movie critic, was seemingly impressed with. But that is hardly enough to remove it from the pale of obscenity.[14]
It does, in fact, demean and pervert the sexual experience, and insults it, shamelessly, without tenderness and without understanding of its role as a concomitant of the human condition. Therefore, it does dirt on it; it insults sex and the human body as D. H. Lawrence would describe condemnable obscenity (Sex, Literature and Censorship, pp. 69, 74-79 [1953]). It “focuses predominantly upon what is sexually morbid, grossly perverse and bizarre * * *. It smacks, at times, of fantasy and unreality, of sexual perversion and *765 sickness ”. (People v. Richmond County News, 9 N Y 2d 578, 587 [1961]). Justice Stewakt says he knows hard-core pornography when he merely sees it (Jacobellis v. Ohio, 378 U. S. 184, 197, supra). We have seen it in “Deep Throat”, and this is one throat that deserves to he cut. I readily perform the operation in finding the defendant guilty as charged, as to both cases.
APPENDIX
WHAT IS IT ALL ABOUT?
To accept the defense arguments, that this indisputably obscene film — this feast of carrion and squalor — is constitutionally protected and outside the ambit of prohibition of section 235.05 of the Penal Law would deny, in my view, any validity or meaning to our and all anti-obscenity laws and to the volumes of precedents supporting them. And it would also support the position of those who say that the State has no legitimate power or justification to legislate on matters of morality and particularly sexual morality. To this end, I believe, the defendant’s arguments are essentially directed, without expressly saying so.[1]
It is, of course, a predicate of historical truth that the police power extends not only to the preservation of good order but similarly to the preservation of public morals. Such regulation has always been thought to satisfy certain important imperatives in a systematic manner, which is generally considered to be valuable. The State is said to have a legitimate right to legislate in the field of morality, and particularly sexual morality, and this right is deeply part of our law. (Bear Co. v. Massachusetts, 97 U. S. 25, 33 [1877]; Lochner v. New York, 198 U. S. 45, 53 [1905]; Roth v. United States, 354 U. S. 476, 485, 502, supra; Stanley v. Georgia, 394 U. S. 557, 566 [1969]; Poe v. Ullman, 367 U. S. 497, 545-546 [1961]; Henkin, “ Morals and the Constitution: The Sin of Obscenity ’ ’, 63 Col. L. Rev. 391.[2]
*766 Recognizing then that, historically, the State had, and, the courts say, it still has, a legitimate social interest in this regard, should it continue to exercise the power with respect to all moral issues, particularly as to sexual morality; and if so, should it extend to the private at well as the public area. This debate has plagued and excited the ages, and today’s liberality will not resolve it. And, of course, u Deep Throat ’ ’ is vigorously part of that discussion.
Today’s debate is somewhat circumscribed about public, rather than private, morality. Our understanding, cultured by the gentle pressures and experimentation of centuries, has, I believe^ refined itself to the point where society will tolerate any conduct in private if noninjurious and not disruptive to others. For this reason many would recommend an end to the crime of consensual sodomy in private, leaving its public prohibition. The willing receipt and possession of obscene material, and the private thoughts generated by it, are now enshrined with the private bedroom, as safe from government encroachment, and now understood to be a basic constitutional right. That, of course, is the court’s meaning of Stanley v. Georgia (supra), and what it did, I believe, was merely to reflect the consensus of our People as well as good constitutional law.
But it also recognized a verity of the ages — that in all civilized societies, certain things which could be done in private should not, with impunity, be done in public. The court said that in Stanley, did it not, when it confirmed the State’s power and justification to control “ dissemination of ideas inimical to public morality” (394 U. S. 557, 566). And this basic and ancient postulate appears to represent the will of the People, as reflected in the anti-obscenity laws in each of our 50 States and Federal government. (Roth v. United States, 354 U. S. 476, 485, supra.) This also appears to be the reason that large forward-thinking citizen organizations, such as the Alliance For A Safer New York (a conglomerate of about 80 New York City civic, religious and labor organizations) can recommend the repeal of almost all laws relating to “ victimless crimes,” including consensual sodomy, but “ has not yet evolved a definite *767 policy” as to “pornography” (Edwin Kiester, Jr., Crimes With No Victims, 1972, p. 73). It would appear then that the United States Supreme Court (and lower courts accepting its leadership) and our People see a possible social effect of obscenity, but are unconcerned with its private manifestation, where society believes, social effect,, if any, is de minimis.
However, there are thoughtful commentators, like Mr. Justice Douglas, who oppose anti-obscenity laws upon the main ground that they see no causal relationship between obscenity and illegal or anti-social conduct. They would go further and divorce the State from all moral concerns (both private and public) not demonstrated to be “ brigaded with illegal action.” (Memoirs v. Massachusetts, 383 U. S. 413, 426, supra). Also: The Report of the Commission on Obscenity and Pornography, 1970. Since no unequivocally scientific relationship has been found, shall we abolish anti-obscenity laws (public morality) to await the behavioral sciences’ proof of the connection?[3] The United States Supreme Court has refused to decide the question or even concern itself with the argument. “That function,” it says, “belongs to the state legislature.” (Roth v. United States, 354 U. S. 476, 486, 501, supra; Beauharnais v. Illinois, 343 U. S. 250, 266 [1952]).
Without scientific proof, is there not a basis in logic and common experience that the sky-is-the-limit type of pornography, especially the ‘ ‘ Deep Throat ’ ’ kind, has an eroding and corrupting effect on society’s moral fabric, which, as aforesaid, we always thought important to enshrine? Our laws aré full of inferences and assumptions, requiring no support of “ hard ” proof, because we “know” by life’s experiences, that abstract truth is no less valid, given the proper context, than scientific formulation.
And so, can we not agree with Justice Hablan when -he says (Roth, 354 U. S. 476, 502, supra), that assuming there is no *768 empirical evidence that obscenity causes, in an immediate sense, anti-social conduct, nevertheless ‘ ‘ The State can reasonably draw the inference that over a long period tif time the indiscriminate dissemination of materials, the essential character of which is to degrade sex, will have an eroding effect on moral standards.”
Our armchair nihilists would have us abrogate the anti-obscenity laws with the argument that matters of sex and propriety are subjects best taught in the schools, and the liberty of the adult to see and read what he wishes should not be diminished for the supposed protection of the young. But may we not ask: Where there are no societal restraints, by law and language, will not the parent, the church, the synagogue and the school, being all alone, fail in their effort? Many see the schools, where wholesome disciplines and logical restraints are fast dissipating (and where challenge to authority often and quickly results in the school’s surrender) soon joining the permissiveness and cynicism of its surrounding, polluting environment.[4]
Character is shaped by the sum total of the influences and incitations, which ply the sea of the mind. It admittedly begins with consciousness itself. The much respected, the late Justice Samuel H. HoEstadter of the New York State Supreme Court and my colleague, Judge Shirley R. Levittan agree, with so many others, that books, movies, magazines and all the social stimuli affect us, imperceptibly perhaps when taken singly, but measurably when accepted cumulatively. 1 ‘ It is a poor service to the cause of intellectual freedom and artistic feeling,” they said ‘ ‘ to pretend that art and literature have no effect on conduct.”[5] Irving Kristol, Professor of Urban Values at New York University, cogently speaks of the matter in this fashion (Nexo York Times Mag., March 23, 1971, p. 24): “ After all, if you believe that no one was ever corrupted by a book, you have also to believe that no one was ever improved by a book (or a play or a movie). You have to believe, in other words, that all art is morally trivial and that, consequently, all education is morally irrelevant. No one, not even a university professor, really believes that.”
*769 What then is the resultant quality of character when influenced, over long periods of time, by a suffusion of obscenity? The sages and our common man have never viewed it as having a salutary but rather a negative effect (notwithstanding Justice Douglas and the majority report of the Commission on Obscenity and Pornography). They learned that cheapness breeds cheapness, and filth more filth. They understand that what it does, to again quote Professor Kristol, is ‘ ‘ to deprive human beings of their specifically human dimension. That is what obscenity is all about. ’ ’ It relegates the ‘ ‘ human-dimension ” to the debased level of the unfeeling, shameless' and loveless beast. Our present-day nihilists fail to understand this connection and its validity in either practical or philosophical terms. What the absolutists seek is not temperance, the logicality of civilized conduct and which our present obscenity. laws attempt to achieve, but rather self-indulgence, which is the historic touchstone for intellectual indolence and destruction.
Further, were we to remove indiscriminately, societal safeguards, and permit everyone “to do his thing,” what disciplines remain to distinguish the worthy from the gross trash, the dross such as ‘ ‘ Deep Throat ’ ’ ?[6] And would not this new liberty of total permissiveness become a “Magna Carta, for the pornographer, ”[7] to give license to ascend to greater and greater heights of degradation and violence, to depictions and perhaps the glorification of necrophilia and bestiality, and then, whatever? If we are to become inundated, as we are fast becoming, "with trash in the arts, in language, in dress and so much more that makes for society’s acceptable norms, what enlightened standards would remain to permit us to ascend ‘ ‘ from plateau to plateau and finally reach the world of enduring ideas ” (Ginzburg v. United States, 383 U. S. 463, 492 [1966], dissent, Douglas, J.) ? Can there be value in a society where everything has value?
Justice Harlan, in the aforesaid quote, raises a question which many find cogent and troubling in the light of our new ‘ ‘ sexual liberty. ’ ’ What many see in the unrestrained depiction of explicit sexuality and in gross obscenity generally, is the serious and damaging inroads into the tone of society, the mode, the style and quality of life, now and in the future. It hangs *770 as a pervasive malaise over our moral consciousness. Alexander Bickel (The Public Interest, No. 22, Winter, 1971, p. 26) speaks of it in this fashion:1 ‘ A man may be entitled to read an obscene book in his room, or expose himself indecently there, or masturbate, or flog himself, if that is possible, or what have you. We should protect his privacy. But if he demands a right to obtain books and pictures he wants in the market, -and to' foregather in public places — discreet, if you will, but accessible to all— with others who share his tastes, then to grant him his right is to affect the world about the rest of us, and to impinge on other privacies. Even supposing that each of us can, if he wishes, effectively avert the eye and stop the ear (which, in truth, wé cannot), what is commonly read and seen and heard and done intrudes upon us all, want it or not; ’ ’
There it is. ‘ ‘ Deep Throat ’ ’ and all its genre, want it or not, impinges unavoidably on the privacy of each of us, especially the multitudes upon multitudes who have not and will not pay the $5 admission fee or any price.
Further, it pollutes as noxious gas and helps deteriorate the fiber of great city places such as Times Square; It often attracts the unsavory to own, operate and maintain it. In a long investigatory article, dated December 10, 1972, reporters Ralph Blumenthal and Nicholas Gage, (New York Times, p. 1) stated ‘ ‘ In less than four years, organized crime ‘ families ’ in New York have made pornography their fastest growing new racket. . . . Racketeers have also discovered that pornography has a major advantage over traditional rackets. Confusing and sometimes contradictory court decisions make distributing pornographic material a lot safer than making book, selling heroin or loan-sharking. . . . Other Mafiosi are known to be investing in film in which sexual acts are part of some kind of story line. The films are often shown in commercial theaters.”
These important issues can cause famous liberals, such as Lord Devlin and Professor H. L. A. Hart to fervently and brilliantly differ in public debate.[8] They can also cause liberals *771 like Drs. Phyllis and Eberhard Kronhausen, D. H. Lawrence, Dr. Benjamin Spock, Morris Ernst, and many others, to decry the brutalization of society, represented by the present proliferating hard-core pornography in films, books and magazines.[9] They can cause such representatives of the liberal press, as The New York Times, to editorialize, as it did on April 1, 1969, (p. 46), in this manner: “ The explicit portrayal on the stage of sexual intercourse is the final step in the erosion of taste and sublety in the theater. It reduces actors to mere exhibitionists, turns audiences into voyeurs and debases sexual relationships almost to the level of prostitution.
“It is difficult to see any great principle of civil liberties involved when persons indulging themselves on-stage in this kind of peep-show activity ... in displaying sodomy and other sexual aberrations, reached the reductio ad obscenum of the theatrical art. While there may be no difference in principle between pornography on the stage,- on the screen and on the printed page, there is a difference in immediacy and in direct visual impact when it is carried out by live actors before a (presumably) live audience.
‘ ‘ The fact that the legally enforceable standards of public decency have been interpreted away by the courts almost to the point of no return does not absolve artists, producers or publishers from all responsibility or restraint in pandering to the *772 lowest possible public taste in quest of the largest possible monetary reward. Nor does the fact that a play, film, article or book attacks the so-called ‘ establishment, ’ revels in gutter language or drools over every known or unknown form of erotica justify the suspension of sophisticated critical judgment.
“ Yet this does .seem to be just what has been suspended in the case of many recent works, viz., one current best-seller hailed as a ‘ masterpiece,’ which, wallowing in a self-indulgent public psychoanalysis, drowns its literary merits in revolting sex excesses.
‘ ‘ The utter degradation of taste in pursuit of the dollar is perhaps best observed in films, both domestic and foreign, such-as one of the more notorious Swedish imports, refreshingly described by one reviewer unafraid of being called a ‘ square ’ as 1 pseudo-pornography at its ugliest and least titillating and pseudo-sociology at its lowest point of technical ineptitude. ’
‘ ‘ Far from providing a measure of cultural emancipation, such descents into degeneracy represent caricatures of art, deserving no exemption from the laws of Common decency merely because they masquerade as drama or literature. It is preposterous to banish topless waitresses when there is no bottom to voyeurism on the stage or in the movie houses.”
(Certainly, what the editors say of the stage is stark reality as well on the screen.)
These issues can also deeply disturb a thoughtful Judge. And although his views may very well be the unwitting distillation of his social history, which Justice Caudozo characterized as “the empire of [these] subconscious loyalties,”[10] they cannot be dismissed merely as private notions; for they are imbedded into and built upon ancient and continuing vibrant constitutional verities. So armed, he must, and is expected to exhibit the courage to express and support common moral standards, no less than the courage to express innovation, when law and circumstance require.
As noted, these, fundamental issues do not require nor have they resulted in the positioning of the civil libertarians on the one side and the alinement of the philosophical conservatives on the other. Basic here, is not merely the legality of one film, but essentially whether criminal sanctions against promoting (Penal Law § 235.00, subd. 4) obscene material shall be fully lifted, as an acquittal here would certainly and affirmatively imply. On this issue citizens of both persuasions join hands.
*773 As a society we have come upon the crossroads, but we have not as yet crossed the road. To find “ Deep Throat ”, and the rest of its genre, legally viable, will not only cross the road, but would help obliterate it as well. The law, common sense and the history of experience, tell us that this is not in society’s best interest, nor do present community standards, whether National or State, demand it.

. The defendant was charged with two separate violations, in that, it presented the film involved on August 17, 1972 (Docket No. A54434) and on August 29, 1972 (Docket No. A63354).

. The defendant moved in the Supreme Court for a jury trial; the motion was denied, in that the defendant, as a corporation, had no right to a jury trial. (Mature Enterprises v. Hogan, N. Y. L. J., Nov. 16, 1972, p. 2, col. 1.)

. New York limes, Arts and Leisure Sect., p. 1, Jan. 21, 1973. Ellen Willis in the New York Review of Books, Jan. 25, 1973 (pp. 22, 23), characterizes the jokes as “moronic.” .

. One witness further identified it as “ the missionary position,” enlightening the court with his learned advice that missionaries also had something to do with sex education.

. Nora Ephron, in reporting a conversation she had with the female lead (Esquire, Feb. 1973), reports that this' "actress” said — “I totally enjoyed myself making the movie and all of a sudden I’m what you call a superstar.” Also, one defense witness thought this scene “ had humor.”

. Subdivision 1 of section 235.00 of the Penal Law differs slightly in language but its meaning and intent are the same.

. Childs v. Oregon, 401 U. S. 1006 (1971); Hoyt v. Minnesota, 399 U. S. 524 (1970); Mazes v. Ohio, 388 U. S. 453 (1967); A Quantity of Copies of Books v. Kansas, 388 U. S. 452 (1967); Books v. United States, 388 U. S. 449 (1967); Corinth Pubs. v. Wesberry, 388 U. S. 448; Aday v. United States, 388 U. S. 447 (1967).

. “It is no easier to define hard-core pornography than obscenity. Experience, including that of judicial expertise, demonstrates that any attempt at such formal verbal expression is doomed to failure, * * * Legal definitions *757 reflecting earlier stimuli distort the present when dogmatically applied ” (Hofstadter and Levittan, “No Glory, No Beauty, No Stars — Just Mud,” 37 N.Y.S.B.J. 40).

. Justice Stewart would limit proscription to hard-core, in which he sees '“a distinct and easily identifiable class of material in which all of these elements [Both-Memoirs criteria] coalesce.” (Ginzburg v. United States, 383 U. S. 463, 499, supra). Justice Harlan agrees, when he says hard-core “does describe something that most judges and others will ‘know . . . when [they] see it’ ** * * and that leaves the smallest room for disagreement between those of varying tastes” (Memoirs, 383 U. S. 413, 457, supra). He also expressed this view in Roth v. United States (354 U. S. 476, 507-508, supra).
Albert B. Gerber, Esq. specializes in obscenity and pornography litigation, and authored, “ Sex, Pornography and Justice ” (1965). He consistently opposes anti-obscenity laws. However, he tells us that “where sexual acts and perversions áre imitated on stage, it is dubious whether any court for a long time to come will grant the protection of the Constitution.” (Wilson Library Bulletin, Feb. 1970, p. 644). Of course, there is nothing simulated or imitated in “ Deep Throat ”; it is quite real.

. D. H. Lawrence, the author of “Lady Chatterly’s Lover”, understands hard-core pornography “by the insult it offers, invariably, to sex and to the human spirit. Pornography is the attempt to insult sex, to do dirt on it * * * Such material is an * * * insult to the human body, the insult to a vital human relationship. Ugly and cheap they make the human nudity; ugly and degraded they make the sexual act, trivial and cheap and nasty.” And such material he would vigorously have censored. (“Pornography and Obscenity in Sex, Literature and Censorship” [1953], pp. 74-79.)
Mr. Justice Stewart describes it as material “with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character.” (Ginzburg v. United States, 383 U. S. 463, 499, n. 3 [1966]).
People v. Richmond County News (9 N Y 2d 578, 587) tells us that hardcore “focuses predominantly upon what is sexually morbid, grossly perverse *758 and bizarre * * * depicting dirt for dirt’s sake, the obscene is the vile, rather than the coarse, the blow to sense, not merely to sensibility. It smacks, at times, of fantasy and unreality, of sexual perversion and sickness

. Ratner v. California (388 U. S. 442 [1967]), sex acts not described;, Cobert v. New York (388 U. S. 443 [1967]), stag film for private home use, sex acts not described; Schackman v. California (388 U. S. 454 [1967]), peep show movies for coin-operated machines, sex simulated; I. M. Amusement Corp. v. Ohio (389 U. S. 573 [1968]), two nude women acting parts of lesbians, fondling themselves; Robert-Arthur Mgt. Corp. v. Tennessee (389 U. S. 578 [1968]), nude women caressing each other in lesbian fashion; Cain v. Kentucky (397 U. S. 319 [1970]), nude woman caressing herself, man kisses her stomach, then camera focuses on expression of satisfaction during intercourse, then other similar acts of intercourse; Bloss v. Michigan (402 U. S. 938 [1971]), sex acts not described; Hartstein v. Missouri (404 U. S. 988 [1971]), nude women gyrating and scenes of physical violence. California v. Pinkus (400 U. S. 922 [1971]), stag movie for private home usé; woman feigns self-induced sexual satisfaction.

. Certiorari was granted for United States v. Unicorn Enterprises involving the same film (401 U. S. 907 [1971]), and covered this case as well. However, the writ of certiorari was later dismissed pursuant to agreement of the attorneys (403 U. S. 925 [1971]).

. During the trial of this case, defense counsel represented to the court that the Binghamton jury made a “special finding” (whatever that might conceivably mean) of obscenity. I requested counsel to secure a copy of the “special finding.” He failed to do so. The court, however, has secured a certified copy of that portion of the minutes announcing the verdict. This is what was said:
The Court: Mr. Benson, has the jury arrived at a verdict?
The Foreman: Yes, we have, your Honor.
The Court: What is your verdict?
The Foreman: Not guilty. I would like to request that I be able to make a statement.
The Court: Just a minute. Is this verdict unanimous ?
The Foreman: It is.
The Court: Do you wish the jury polled?
Mr. Coutant: No, your Honor.
The Court: What comment do you wish to make?
The Foreman: We wish to have in the record that this verdict does not reflect our personal opinions but rather it is- the result of what we feel to be an extremely poorly and loosely written law.
The Court: Very well.
Now, we wonder, in the light of the foreman’s statement, • what was the real meaning of the verdict and what did it say of the community standards in Binghamton, New York. (People v. Binghamton Theatres, Inc., tried Dec. 12-16, 1972 before City Court Judge Walter T. Gorman).

. “ This court will not adopt a rule of law which states that obscenity is suppressible but well-written [or a technically well produced] obscenity is not.” (People V. Fritch, 13 N Y 2d 119, 126).
“A Michelangelo could find no solace from legal restraint if his art b'* obscene.” (People v. Kirkpatrick, 64 Misc 2d 1055, 1086, supra).

. There are now before the United States Supreme Court three eases which raise basic questions as to all anti-obscenity laws, particularly whether obscene material may be disseminated to consenting adults. (People v. Kaplan, 23 Cal. App. 3d Supp. 9, cert, granted 408 U. S. 921; Paris Adult Theatre I v. Slaton, 228 Ga. 343, cert. granted 408 U. S. 921; Alexander v Virginia, 212 Va. 554, cert. granted 408 U. S. 921.)

. In Poe v. Ullman (367 U. S. 497, 545-546, supra), Harlan, J. had this to say in his dissent: “Yet the very inclusion of the category of morality among state concerns indicates that society is not limited in its objects only to the physical well-being of the community, but has traditionally concerned itself with the moral soundness of its people as well. Indeed to attempt a line between public behavior and that which is purely consensual or solitary would be to withdraw from community concern a range of subjects with which every society *766 in civilized times has found it necessary to deal. The laws regarding marriage which provide both when the sexual powers may be used and the legal and .societal context in which children are born and brought up, as well as laws forbidding adultery, fornication and homosexual practices which express the negative of the proposition, confining sexuality to lawful marriage, form a pattern so deeply pressed into the substance of our social life that any Constitutional doctrine in this area must build upon that basis. Compare McGowan v. Maryland, 366 U. S. 420.”

. The Report of the Commission on Obscenity and Pornography (The New York Times Ed. 1970) claims to prove the absence of this connection. However, the minority report illustrates several instances that the majority’s research was inaccurate and the methods used unprofessional. Others refuse to accept the majority’s report as' convincing proof. Also President Nixon and a majority of the Senate by a vote of 60 to 5.rejected that report. (N. Y. Times, Oct. 14, 1970, p. 30, col. 3.)
John Stuart Mill denied that the State may legislate on .moral matters and could only do' so “ over any member of a civilized community against his will as to prevent harm to others”; and moral harm, he said, is not sufficient to warrant legal forebearance. (On Liberty, ch. I.) Our present day disciples often quote Mill with relish.

. In its course " Filmmakers ” (for which it charges $60), New York University has as its guest lecturer the executive producer of "Deep Throat”, whose subject will be " sensuality, eroticism and the law, and excerpts from Deep Throat are screened ” (Bulletin, School of Continuing Education, Spring 1973, p. 35). Is this to be a new art form, with bigger, better and deeper “ Deep Throats”?

. "No Glory, No Beauty, No Stars— Just Mud,” 37 N. Y. S. B. J.

. Vincent Canby in his discussion of the merits, or more exactly the demerits, of the film characterized it as “junk” and remained junk, even after seeing it a second time. (N. Y. Times, Jan. 21, 1973, Arts & Leisure Section p. 1.)

. Minority Report — Commission on Obscenity and Pornography, supra, p. 456.

. Lord Patrick Devlin (The Enforcement of Morals, Oxford Univ. Press 1968 ed.) postulated that what makes a collection of citizens a society is a “ shared morality,” which acts as “ the cement of society^’ and that any loosening of the cement contributes to its disintegration; that the State should use the law to preserve morality (including sexual morality) as it uses it to safeguard anything else essential to its existence; that there is no theoretical limits to the power of the State to legislate against immorality, and that ■ changes in the moral code must come very slowly where the society sees a needed departure from and finds a substitute for established moral standards. He generally sees no basic differences between private and public morality, when he says — *771 “ The suppression of vice is as much the law’s business as the suppression of subversive activities; it is no more possible to define a sphere of private morality than it is to define one of private subversive activity ” (pp. 13-14).
Professor H. L. A. Hart (Law, Liberty and Morality, Vintage Books, 1963 ed.) agrees that society may use the law to preserve morality, but disagrees that sexual morality is a legitimate State concern, and its enforcement has no “utilitarian reason” or “universal value” as necessary to society’s survival. (Also: Louis Henkin: “Morals and the Constitution; The Sin of Obscenity ”, 63 Colum. L. Rev. 391 [1963]; Basil Mitchell: Law, Morality and Religion in a Secular Society; Oxford Univ. Press, [1970].)

. Kronhausen, “ Pornography and the Law ” [1959]; D. H. Lawrence, “ Pornography and Obscenity in Sex, Literature and Censorship ” [1953]; Dr. Benjamin Spock, “ Decent and Indecent ” [1969].
Morris Ernst, the defender of Joyce’s “ Ulysses,” and other material, described as “the noted civil liberties lawyer and a long time opponent of censorship” in a news article appearing in the New York Times (Jan. 5, 1970, p. 46, col. 2), is quoted as saying that he would not choose “ to live in a society without limits to freedom.” Further, “ Whereas I defended the book and legitimatized a four-letter word, that doesn’t mean that 5 * sodomy on the stage or masturbation in the public arena here and the world over.” Further, “ I deeply resent the idea that the lowest common denominator, the most tawdry magazine, pandering for profit '* should be able to compete in the marketplace with no restraints.”

. Benjamin Cakdozo (“ The Nature of the Judicial Process, Yale TJniv. Press, 1921, p. 175).