Joel J. Tyler, J.
The defendant was charged, under two separate dockets, and found guilty on March 1, 1973 after an extended trial, of promoting the obscene film, “ Deep Throat ”, on August 17 and again on August 29, 1972, in violation of subdivision 1 of section 235.05 of the Penal Law.
By order, dated March 1, 1973, this court directed a hearing to be held March 15, 1973, to determine the amount of the corporation’s gain from the commission of the crime, under the purview of paragraph (e) of subdivision 1 of section 80.10 of the Penal Law, as a basis for determining the amount of the fine to be imposed. The hearing was conducted under the procedure mandated by CPL 400.30, which places the burden upon the People to establish the amount of defendant’s gain by “ a preponderance of the evidence ’ ’, and permits broad acceptance of relevant evidence, unrestrained by the usual exclusionary rules of evidence.
The hearing commenced on the scheduled date and continued on March 16, 19i, and 20, 1973 and reopened on March 27, 1973,' to. permit defendant to prove the making of certain records, of *774 income and expenses, previously introduced by the People as o Exhibit 13. These records were reintroduced by defendant as its Exhibit “ A ”.
Defendant’s Position
Defendant has opposed this hearing on these grounds:
■ (a) The defendant’s “ gain ”, as defined in subdivision 3 of section 80.00 of the Penal Law, would restrict any determination of profits beyond the two specific dates stated in the complaints. You cannot be fined, says defendant, for commission of crimes with which you were not charged and for which you were not tried. Therefore, defendant maintains it cannot be fined in excess of $5,000 for each of the two charges as provided in paragraph (b) of subdivision 1 of section 80.10 of the Penal Law, and this in spite of the fact that the film was presented (i.e., promoted) continuously and admittedly from June 12, 1972 through at least February 25, 1973, which defendant claims to be irrelevant.
(b) Further, if the defendant’s gain from the commission of the crime may properly be computed upon the income of the entire 37-week period of its public showings and the fine ordered to equal double that gain, it would be excessive, unreasonable, in violation of law, and may very well bankrupt the defendant corporation.
The Background
On or about September 7,1972, Judge Ernst H. Rosenberger of this court, after viewing the film, issued a warrant for its seizure, and the film was seized. However, the following day, the same Judge ordered the return of the film to defendant, upon the authority of Bethview Amusement Corp. v. Cahn (416 F. 2d 410 [1969], cert. den. 397 U. S. 920) and Astro Cinema Corp. v. Mackell (422 F. 2d 293 [1970]).[1] He directed an adversary hearing prior to the issuance of a new seizure warrant and he signed a subpoena for service upon defendant for the production of the film at such hearing or trial. Accordingly, the film continued to be presented uninterrupted and the People promptly pressed for a trial, since it could not otherwise stop the showing of the film.
*775 However, the requested adjournments by the defendant from the first time the cases appeared on the calendar were extraordinary in number. For example, with respect to Docket No. A54434, the case was on the calendar nine times before the day of trial, but it was adjourned, at defendant’s request, six times; by the court three times and none by the People; and all of this over a period from September 8, 1972 to December 18, 1972, almost three and one-half months. Also during that time the case was marked ‘ ‘ Final against the Defendant ’ ’ on two occasions prior to the date of trial.
As to Docket No. A63354, the case appeared on the calendar eight times before the date of trial; it was adjourned, at defendant’s request, six times; by the court two times and none by the People; all during the period from October 2 to December 18, 1972, about two and one-half months. During that period the case was also marked “ Final against Defendant,” on two occasions prior to the date of trial.
During that period, defendant corporation made a motion for a jury trial before two different Judges of this court, and both such separate motions were denied, since defendant, as a corporation, had no right to a jury trial. The defendant further delayed the proceeding, by making the same motion before Mr. Justice Isidore Dollihger of our Supreme Court and that was again denied. (Mature Enterprises v. Hogan, N. Y. L. J. Nov. 16, 1972, p. 2, col. 1.) It then pursued with this apparently baseless motion, to the Appellate Division, which on November 17, 1972 granted a stay of the action in this court, pending an appeal of Mr. Justice Dollinger’s order. The stay was vacated November 28,1972.
On the very first day of the trial, on December 18, 1972, the same defendant’s attorney again attempted to delay the trial by moving before this court again for a jury trial, without advising the court of the prior denials of his motion by at least three Judges. The Assistant District Attorney, however, alerted the court to these facts. And further, as evidence of the continued unjustified delay, it must be noted, that although this court set an agreed date for the filing of briefs after the trial, two extensions were granted at defendant’s request, but, nevertheless, defendant’s attorney failed to file a brief.
These significant facts point to the reality that the defendant, through its counsel, used many tactics to delay the trial, and did delay the trial long beyond the time when it could have secured a prompt and final disposition of the cases. Of course, during all this time it continued the uninterrupted and calculated *776 purveyance of its indisputably obscene and illegal film, with resultant and progressively increasing large profits. These factors may not go unnoticed, and is a legitimate concern in deciding upon a sentence.
Further, I am convinced that the defendant knew and had more than good reason to believe that the film it was promoting was illegal and that its sole purpose, of course, was to garner as much income and profit from its continued illegal acts. Certainly, the defendant had expert legal advice, including the experienced attorney who tried not only these cases, but many other similar cases. Surely, the defendant was advised that nowhere in this country was any such film ever given legal sanction by any court. As indicated by this court in its opinion of March 1, 1973 (73 Misc 2d 749), this film is so unmistabably, brazenly and clearly illegal, that such determination could have been made by any lawyer, practiced in obscenity law or not.
The press certainly had no trouble in viewing “ Deep Throat ” as clearly hard-core pornography, as I indicated in that opinion. Further, its very advertisements of the film (see opn. of March 1, 1973, 73 Misc 2d 749, 752) not only presented evidence of pandering but gave further proof, if any was needed, that defendant was aware of its probable illegal content. There was no denial at the trial by the defendant that the film represented hard-core pornography, nor could there have been.[2] The showing of “ Deep Throat ” was initiated and continued, therefore, in clear and abject defiance of our laws. These factors as well may not here go unnoticed.
Discussion
■Subdivision 3 of section 80.00 of the Penal Law, and paragraph (e) of subdivision 1 of section 80.10 are new; there were no comparable statutes in the old Penal Law. Apparently, there are no reported cases interpreting or applying either provision. Nor have counsel and the court found any statement of intent expressed by the Legislature. Although Connecticut and Florida have enacted similar statutes in 1972 (Conn. Gen. Stat. Ann., Penal Code, § 53a-44; Fla. Stat. Ann., § 775.083), there appear to be no reported cases nor legislative intent stated there either.
*777 Paragraph (e) of subdivision 1 of section 80.10 of the Penal Law provides that a sentence to pay a fine, in the case of a corporation convicted of a misdemeanor, need not be limited to $5,000 (subd. [b]), but in the court’s discretion, may be fixed at “ Any higher amount not exceeding double the amount of the corporation’s gain from the commission of the offense.”
Certainly, a fair interpretation would permit the fixing of such higher amount at any point so long as it does not exceed twice the amount of the gain.
Subdivision 3 of section 80.00 of the Penal Law insofar as here applicable (§ 80.10, subd. 3), defines “ gain ” as “ the amount of money * * * derived from the commission of the crime, less the * * * value of property * * * seized by or surrendered to lawful authority prior to the time sentence is imposed.”
The term “ gain ” should be fairly interpreted as the 11 net gain ’ ’; that is, gross receipts less legitimate expenses, including taxes.
Pursuant to CPL 400.30, this court signed an order on March 1,1973, directing a hearing to be held on March 15,1973 to determine defendant’s gain, and further ordered the defendant to make available to the District Attorney, for copying and immediate return to defendant, certain specified financial books and records relating to the exhibition of “ Deep Throat ” from the date it was first exhibited to March 1, 1973. All copies of the film were also ordered to be surrendered. A copy of the order was delivered, in the court’s presence, to defendant’s attorney. The order was then signed, unchanged and in the form presented by the Assistant District Attorney (original attached to Docket No. A54434).
The hearing was commenced on March 15, 1973, as aforesaid; however, the records were not delivered to the District Attorney as directed. As indicated by the testimony of Officer Michael Sullivan, although he secured the film, he was unable to serve a copy of the said order upon any officer or Robert R. Sumner, the president of the defendant corporation, and its sole stockholder.[3] The officer’s testimony clearly indicated that he made every reasonable effort to locate Mr. Sumner,- and it was apparent that Mr. Sumner avoided being served with the order. As further indication of such avoidance, Donald Bunsis, the defendant’s former accountant testified, on the first day of the hear *778 ing, that he had received a telephone cal! from Mr. Sumner the previous day and was told by him that “ everything was going smoothly and the proceedings were ended. ’ ’ Mr. Sumner did not appear throughout the hearing as distinguished from the trial, where he appeared and remained throughout.
Certainly, the defendant could not be convicted for the showing of the film on dates other than August 17 and 29, 1972, the two dates charged in the complaints. But we are not now concerned with a trial or conviction. We are now concerned with sentence, and there, factors are always considered which may be unrelated to, and improper if attempted to be introduced at a" trial.
What we must determine is the intended meaning of the term, “ commission of the crime ” as used in the aforesaid provisions, and how may it be appropriately applied to the circumstances here.
Admittedly, penalties must be expressly imposed by statute, and the statute strictly construed. (Osborne v. International Ry. Co., 226 N. Y. 421, 426 [1919]; New York State Thruway Auth. v. Maislin Bros. Transp., 35 A D 2d 301, 303 [1970].) The one who seeks to recover a penalty must bring the case clearly within the intended terms of the statute. (Dairymen's League Co-op. Assn. v. Brockway Co., 173 Misc. 183, 185 [1940]; City of New York v. Benenson, 41 Misc 2d 20, 24 [1963]; People v. Consolidated Edison Co. of N. Y., 41 A D 2d 809.)
However, such limitation is colored by and must be understood in relation to the dominant postulate that the objects of law and promoting justice must be supported and given effect. To accomplish that result, a penal statute must be construed according “ to the fair import ” of its terms (Penal Law, § 5), and its interpretation may not be so strained as to permit contrary results and the easy avoidance of legal restraint. A statute may not be so interpreted so that its effept would tend to encourage violation.
The provision of section 80.10 of the Penal Law permitting the imposition of excess fines was intended by the Legislature to compel the offender to disgorge all ill-gotten gains, that is, to take the profit out of crime. It presents an alternative to the court to gear the fine to such gain. (Practice Commentary, McKinney’s Cons. Laws of N. Y., Book 39, Penal Law, §§ 80.05, 80.10, pp. 164-165, 166.) To give meaning and effect to such legislative purpose, we must apply the practical and effective, *779 no less than the logical, criteria. [See People v. Gittelson, 25 A D 2d 265 [1966, 1st Dept.], affd. 18 N Y 2d 427.)
The commission of the crime of promoting obscenity here was a single and continuing one from June 12,1972 (the first day the film was shown) until it ceased to be shown about February 25, 1973. Accordingly, the “ gain ” realized from the commission of that crime must represent the aggregate of the income during that period, less expenses. The mere filing of the complaint did not mature into a crime that which was theretofore innocent activity. It was the continuous presentation of this distinct and indisputably obscene film which constituted the whole as well as the single “commission of the crime.” And this must be the necessary and reasoned interpretation in considering the degree of sentence, if we are to give meaning to the legislative purpose of removing the profit from crime. That meaning fits well, logically and reasonably in its application particularly to film obscenity cases. This interpretation has no application in the determination of guilt or innocence of the formal charges filed. The afore-mentioned plear legislative intent does not require that we apply the same criteria to the sentence as to the validity of the crimes charged, which are determined on a totally different legal basis.
Further, a fair and just compromise would, I believe, compel the conclusion that the defendant’s gain be computed from the date it was officially alerted to the offense by the filing of the first formal charge, namely, on or about August 21,1972. From that date the defendant was obliged to make every concerted effort to secure the prompt disposition of the case, by trial or otherwise, to help minimize the possible penalty to be imposed if convicted. That trial could have been requested and pressed for as early as September 8, 1972, when the earliest case first appeared on the calendar. However, it would appear that the defendant chose another course of action. It exerted every effort, including the making of the aforesaid unsupportable motions, to delay the trial of the cases as long as it could, with the intent to increase, and, in fact, increasing substantially its gain from its illegal activity. That it may not do with impunity.
Is the law impotent and must it remain frustrated in the face of such seemingly calculated delay? And was it the Legislature’s intention to lend support to the flaunting of its will — to take the profit out of crime? If a legal penalty is to maintain its historic purpose, as not only punishment but as a deterrence for others similarly inclined (promoting clear and unredeemed hard-core pornography), we must then give credence to that *780 meaning of law which would accomplish society’s desired purpose. To do less would not deter violation but encourage it.
Further, to accede to defendant’s arguments may be interpreted to mean that we also approve the continued violation of our law at the cost (in this case) of a paltry penalty, a maximum cost of $5,000 for each formal charge, where the net profit was $152,924, as finally determined. This would represent a mere license fee, a small cost of doing illegal business. As Karl Menninger, noted in ‘ ‘ The Crime of Punishment ’ ’ (Viking Press [1966], p. 211): “ The penalty on the company ought to be something other than the mere expense item of the fine. No fine is going to be of any value unless it is large enough to wipe out the profits made by illegal activity. ’ ’ A result which would not impose a realistic and meaningful penalty in this case may lend support to Bumble’s comment in Oliver Twist, “ the law is a ass — a idiot. ’ ’ The law must not give added force to the cynic.
Further, were we to accept defendant’s arguments, we would in effect have to say that in order that a meaningful fine be imposed to remove the profit from crime, and accomplish the results of this decision, the police would have had to visit defendant’s theatre each and every day over the many months, swear out a new complaint for each such day, and testify at trial to each such viewing. Further, the police would have to continue viewing the film throughout the trial (here it extended for 10 days) and even after the trial while awaiting the court decision, swearing out new complaints for each such additional day, and then perhaps reopening the trial to prove the accumulated daily crimes during the time the court was preparing its decision, which had been reserved at the close of the trial. Surely, the defendant might then complain of police harassment. The law does not and need not require such absurd procedure, to impose a meaningful sentence in this type of case, especially, in the light of sections 80.00 and 80.10 of the Penal Law.
The Fine
The defendant, through its attorney, submitted certain of its financial records, as its Exhibit “ A ”. Witness, Tate G-ordon, testified on behalf of the defendant, to the effect that she is an employee of the corporation and secretary to Mr. Robert R. Sumner (defendant’s president and sole stockholder), and that she typed Exhibit “A” at the request and direction of Mr. Sumner.
These records indicate that the film, “Deep Throat” was first shown at the World Theatre on June 12, 1972 and continuously thereafter through February 25,1973, a period of 37 weeks. *781 It includes the income for each day and the weekly total, less a weekly allowance of $4,000 to the defendant, under an agreement with the distributor. From such reduced weekly total, the expenses are listed and deducted. The remainder is divided equally between the defendant and distributor, and then a 7% New York sales tax is deducted from the defendant’s 50% share. The defendant’s share is further reduced by its operating expenses. Bach of the 37 weeks is so treated. The accountant, for the District Attorney, Mr. Irving Radler, testified at the hearing and submitted his computations of total costs and expenses, including provision for New York City Corporation, New York State franchise and Federal income taxes, which were not included in defendant’s said Exhibit “A ”, His computation (using defendant’s own records), submitted in evidence as People’s No. 13, indicates a net gain of $179,890 from a gross of $1,178,111.
As aforesaid, this court computes the gain, not from June 12, 1972, but rather from August 21, 1972, when defendant was officially apprised of legal proceedings. Accordingly, I have caused the said People’s Exhibit 13 to be recomputed, deducting income and expenses of that 10-week period up to and including August 20, 1972, Such computations are attached hereto as Exhibit “ X ”, indicating a net gain for the period August 21, 1972 through February 25, 1973 of $152,924. I have accepted the defendant’s records and figures in establishing the amount of the fine.
However, there was other evidence at the hearing, taken from Variety, a weekly newspaper and testimony of its publisher, indicating defendant’s gross income of $1,228,025 for those 37 weeks, which is but $49,914 more than the total income figures presented by defendant. However, we used the defendant’s lower figures as a basis of computation.
Since the defendant’s computed net gain was $152,924 from the "commission of the crime, the maximum permissible fine is $305,848 — double the gain. However, I believe that a fair and reasonable fine in this case would be $100,000, and I hereby impose such fine.
This amount is not excessive and well within the means of the defendant to pay, and would accomplish the intent of the aforesaid statute. In this connection, it should be noted that an official of Chemical Bank, wherein the defendant maintains an account, testified that defendant purchased through that bank a total of $200,000 of United States Treasury bills, for which it paid the discount sum of $189,546.72, as reflected by photo static *782 copies of the purchase orders, contained in People’s Exhibit 8, and all were purchased in mid and late February, 1973. These bonds do not represent all of defendant’s assets, as indicated by the bank records and, of course, it has additional profits, not here considered, from June 12 through August 20,1972.

Exhibit “X”

Mature Enterprises, Inc.

Statement of Income & Expenses

Based on Weekly Report Submitted to Court

For the 27 Week Period 8/21/72-2/25/73
Gross Receipts (10 weeks 6/12/72-8/20/72.......... $210,451
Less Expenses Shared With Distributor............ 26,528
183,923
Less 50% Distributor share, as per defendant’s records ....................................... 71,334*
112,589
Less 7% Tax..................................... 4,993
107,596
Less Rent — 8,333.33/mo.^ 2% mo. (10/52 x 100.000) 19,230
88,366
Other — Estimate (Salaries, etc.).................. 27,000
Salaries —1500 x 10 (Payroll Book 15,000)
Other .......................... 12,000)
Estimated Net Profit Before Taxes for Period 6/12/72-8/20/72 ............................... 61,366
Estimated Net Profit Before Taxes for Period 6/12/72-2/25/73 ............................... 392,890
Estimated Net Profit Before Taxes for Period 8/21/72-2/25/73 ................................ 331,524
Taxes — City Corporation................. 22,200
State Franchise.................. 27,800 ■
Federal Income .................. 128,600 178,600
Net Gain .. *........................... $152,924

. The Judge did not follow People v. Heller (29 N Y 2d 319 [1971]). It may have been his view that a seizure under Heller would be an idle gesture, since defendant could, and probably would, apply to the Federal courts for the return of the film and it would be returned under the Federal authority of Bethview and Astro cases, which the Federal court in the Southern District followed consistently theretofore.

. The defendant’s claim that the film was held not obscene by a jury in Binghamton, New York prior to this trial is, in effect, inaccurate. The jury there had no such view of the film. They acquitted defendant, not because they viewed the film as not obscene; but because, as they statéd, they could not understand and apply our obscenity law. (See n. 13 to court’s opinion of March 1, 1973, 73 Misc 2d 763.)

. There was presented sufficient and clear evidence at the trial, which was never denied, that Robert R. Sumner was president of the defendant corporation and its sole stockholder.

 This figure does not represent 50% of $183,923 which is $91,961. However, the records indicate payments totalling $71,334, and we have accepted that lower figure.