**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William L. HAMLING et al.,**
**Defendants-Appellants.**

**Nos. 72–1892 to 72–1897.**

United States Court of Appeals,
Ninth Circuit.

June 7, 1973.

Rehearing Denied Aug. 23, 1973.

Stanley Fleishman (argued), Sam Rosenwein, Hollywood, Cal., for defendants-appellants.

Larry E. Butcher, Atty. (argued), Harry D. Steward, U. S. Atty., John L. Murphy, Chief, Government Regulations Section, Criminal Div., Donald H. Feige, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BARNES and JERTBERG, Circuit Judges, and EAST,* District Judge.

## OPINION

EAST, District Judge:

### STATEMENT OF THE CASE

On March 5, 1971, the Grand Jury for the Southern District of California indicted the above-named defendants, William L. Hamling (Hamling), Earl Kemp (Kemp), Shirley R. Wright (Wright), David L. Thomas (Thomas), Reed Enterprises, Inc. (Reed), Library Service, Inc. (Library), the appellants, and Greenleaf Classics, Inc. (Greenleaf), on 21 counts of alleged violation of Title 18 U.S.C. Sections 2, 371 and 1461.

Count 1 charged the defendants and various other unindicted co-conspirators with conspiring to cause to be delivered by mail obscene advertisements (Brochure), obscene books (Report) and advertisements giving information as to where, how and from whom and by what means the Report might be obtained. (Sections 2, 371 and 1461.)

Counts 2 through 14 charged the defendants with the knowing use of the mails for the carriage and delivery of the Brochure alleged to be a certain obscene, lewd, lascivious, indecent, filthy and vile advertisement to a named postal patron. (Sections 2 and 1461.)

Counts 15 through 18 charged the defendants with the knowing use of the mails for the carriage and delivery to a named postal patron of the Brochure giving information where, how, from whom and by what means the Report alleged to be an obscene, lewd, lascivious, indecent, filthy and vile book entitled "The Illustrated Presidential Report of the Commission on Obscenity and Pornography" might be obtained. (Sections 2 and 1461.)

Counts 19 through 21 charged the defendants with the mailing of the Report.

*Pre-trial Motions:*

The appellants and Greenleaf moved:

a) *To dismiss the indictment* because it failed to inform them of the nature and cause of the charges in violation of the Fifth and Sixth Amendments to the United States Constitution. This motion was denied.

b) *For a Bill of Particulars.* This motion was, except for a continuing order requiring the government to answer certain requests of the defendants and for discovery and inspection theretofore ordered, denied. The inspection ordered provided, inter alia, that "All available exhibits to be used in the prosecution of

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

this matter will be pre-marked at pre-trial October 6, 1971, and made available to defendants for inspection. Failure to pre-mark available exhibits prior to the date of trial will result in their exclusion by the court at time of trial."

c) *To dismiss the Indictment* because no evidence was presented to the Grand Jury which would justify a finding, based on reason, that the publications named in the Indictment were obscene. The motion was denied and there followed a petition to this court for a Writ of Mandamus number 71–2550 which was denied. Whereupon the motion to dismiss was renewed because the government had improperly invited the Grand Jury to return the Indictment "by passion and prejudice" and in "total absence of evidence with regard to obscenity." In support of this motion, the defendants called the government's counsel as a witness to relate the evidence produced and procedure followed before the Grand Jury. The motion as renewed was denied.

d) *To challenge the petit jury panel and to strike the venire* because the jury plan systematically excluded all persons under 25 years of age. The Clerk of the court was called as a witness and testified that the master wheel from which appellants' trial jury would be drawn was filled in 1968 with the names of persons who were registered voters at that time, and that the procedures followed in selecting the names of the registered voters were in accordance with the District Court's plan.

The defendants produced evidence which they claim tended to establish that:

1. Young persons were a cognizable group and were more tolerant than older persons in matters pertaining to the depiction of sexually explicit material; and

2. The venire contained no persons with an age below 24 years.

The motion was denied.

e) For a month's continuance of the trial awaiting the drawing of a new venire. The motion was denied.

*Trial:*

The trial commenced on October 15, 1971, and the jury returned its verdict on December 23rd next. At close of the government's case in chief, the trial court dismissed Counts 6, 14, 18 and 20 for a failure of proof. The defendants moved for a judgment of acquittal on the remaining Counts and again at the close of all of the evidence, which motions were denied. After instructing the jury and while the jury remained in the box, the District Court invited counsel to approach the bench for the notation of objections to the instructions. The defendants requested the court to retire the jury and to hear further objections to the instructions. The trial court declined and heard counsel in close conference out of the hearing, but in the presence of the jury.

The jury found the defendant Greenleaf not guilty on the Counts submitted to them, and all of the appellants guilty on Counts 1 through 5 and 7 through 13 (the conspiracy count and the counts charging the obscenity of the Brochure and the mailing of the same.) The jury was deadlocked and unable to reach verdicts on Counts 15, 16, 17, 19 and 21 (the Counts alleging the obscenity of the Report and the mailing thereof). The appellants moved for an arrest of judgment, for a new trial and an acquittal, all of which were denied.

*Sentences:*

The individual appellants were sentenced to various concurrent and consecutive terms of custody and fines and terms of probation. The corporate appellants were sentenced to fines. The appellants appeal. The individual appellants are at liberty on bail. We affirm.

## STATEMENT OF FACTS

We narrate the record evidence as follows: Some of the named postal patrons testified that they received through the

mails the challenged Brochure advertising the Report and of their respective reactions upon receipt.

The mailings consisted of an outer envelope, bearing the postmark of North Hollywood, California, dated January 12, 1971, and inner return envelope addressed to Library, Post Office Box 20308, San Diego, California, and the Brochure itself, identifying Library as the mailing party. The outer envelope bore postage affixed by Pitney Bowes meter number 173583 (meter). The actual mailing of the material was made by an independent mailing and addressing service and was a part of a total of 55,000 mailings with affixed postage of the packets. The Brochures, mailing material and the meter had been supplied to the mailing service by a Bernard Lieberman of Regent House, Inc. (Regent), of North Hollywood, California, an unindicted alleged conspirator, which was billed $541.15 by the addressing service for the mailing services.

Regent was the lessee of the meter and had paid, through a Paul Wisner, $3,300 to the United States Postal Service for a setting of that amount of postage on the meter. Regent billed and Reed paid the mailing service charge and postage fees with its check signed by its officer, Hamling.

Kemp and Wright signed Postal Service documents for the rental of Post Office Box 20308 on behalf of Library.

A second Pitney Bowes postage meter was rented by Thomas and installed at Library for use in affixing postage to the mailing packets of the Report to those postal patrons responding to the advertising Brochure.

The individual appellants were responsible staff, policy decision making and operating members of the corporate appellants as distinguished from mere "figureheads" officers and directors of their respective corporations.

The Brochure and the Report, as respectively mailed, were each received in evidence.

The government called two experts for opinion testimony advisory to the jury, a Dr. Melvin Anchell, of Los Angeles, a practicing Medical Doctor and practicing Psychiatrist, who qualified as an expert on prurient appeal, and a Frank Getlein, a columnist with the Washington Evening Star in Washington, D. C., who qualified as an expert on contemporary community standards regarding the depiction of sexual activity, and on redeeming social value of written and pictorial communications. The opinions of these experts in their respective fields on the issue of obscenity *vel non* of the Brochure and the Report respectively was that the dominant theme of each was "pruriency," each was patently offensive to contemporary community standards, and was utterly without redeeming social value.

The appellants called five experts for opinion testimony advisory to the jury on the same issue of obscenity, a Dr. Otto N. Larsen, one of the Commissioners of the President's Obscenity Commission, who qualified as an expert and author on sociology subjects generally, including topics in mass communication, family sociology, public opinion, propaganda, public attitudes and like subjects, a Dr. W. Cody Wilson, the Executive Director and Director of Research of the President's Obscenity Commission, who qualified as an expert in the field of social relationships and sexually oriented communications and acceptability thereof by persons and groups of persons, a Professor Dwight V. Swain, a Professor of Journalism at the University of Oklahoma, and Dr. Jack Haberstroh, Assistant Professor of Advertising in the Journalism Department at San Diego State College, who each qualified as experts in their respective fields. The opinions of these experts in their respective fields on the issue were that the Report with its illustrations had great social value, and four of the experts testified that in their opinion the Brochure had redeeming social value and was not obscene.

## ASSIGNMENTS OF ERROR AND DISCUSSION

The appellants assert their assignments of error on the part of the District Court in the form of twenty-two separate statements of issue, some of which are overlapping and repetitious. For the purpose of convenience we rearrange, consolidate and renumber the statements of issue in continuity with the proceedings before the District Court as appears in the following discussion.

*Issues 1 and 2:*

*Whether Title 18 United States Code Section 1461, on its face and as construed and applied, violates the free speech, due process and equal protection provisions of the First, Fifth and Sixth Amendments, and the cruel and unusual punishment provisions of the Eighth Amendment, and the right of the People preserved by the Ninth and Tenth Amendments to the United States Constitution; and*

*Whether appellants were denied rights secured by the Fifth and Sixth Amendments when they were forced to stand trial under a general obscenity statute for conduct not specifically encompassed in the statute and not charged in the Indictment.*

Section 1461 proscribes the knowledgable mailing of "every obscene, lewd, lascivious, indecent, filthy or vile matter, thing, device or substance." The appellants urge that the section is unconstitutionally vague in that the words "obscene, lewd, lascivious . . . ." are undefined, vague and indefinite. Accordingly, the section on its face is unconstitutional and further that the use of the words in the indictment fails to advise them clearly and distinctly of the charge which they were called upon to defend, and they were required "to go to trial with the chief issues undefined." Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240.

▉▉ We conclude that these two assignments are without merit. The language of Section 1461 does "not offend constitutional safeguards against convictions based upon protected material, or fail to give men in acting adequate notice of what is prohibited." Roth v. United States, 354 U.S. 476, at 491–492, 77 S.Ct. 1304 at 1313, 1 L.Ed.2d 1498 (1957), and United States v. Reidel, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971). We subscribe to the ruling of the District Court—"An indictment framed in the language of the statute is not indefinite or vague and the use of statutory language in an indictment is sufficient. The word 'knowingly' as set forth in the indictment sufficiently charges knowledge of all the essential facts as relates to the charge against the defendants." Hopkins v. United States, 405 F.2d 770 (9th Cir. 1969).

Furthermore, the liberal pre-trial discovery and inspection ordered by the District Court and complied with by the government fully and completely advised the appellants of the chief contentions of the government and the materials relied upon.

*Issue 3:*

*Whether the Indictment was returned in violation of the First and Fifth Amendments because:*

*a) the Grand Jury was not presented with any evidence on any of the essential elements of the offense charged;*

*b) Government counsel made biased and prejudiced remarks before the indicting Grand Jury.*

This assignment is predicated upon the testimony of Larry Butcher, the government attorney who presented the government's position to the Grand Jury, and the appellants' version of that testimony is as follows—"Butcher advised the Grand Jury that they were to be 'guided solely by their instinctive feeling . . .'; that they were to be guided by the standards of 'moral judgment' which they had 'assimilated through the totality of their experiences' . . . also, they were 'the sole judges of the contemporary community stand-

ards of this country'; that the term 'contemporary community standards' refers to 'the average conscience of the time.'

"Butcher repeated, under oath, that he had presented no evidence on community standards, prurient interest or social value to the Grand Jury.

"Although Butcher was not sworn as a witness before the Grand Jury, he discussed the factual situation in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), placing particular emphasis on a publication involved in *Ginzburg*; he discussed the extent of the sales of the book involved in the *Ginzburg* case, and the advertisement involved in that case; he 'drew a parallel' between the *Ginzburg* case and the case at bar, emphasizing for the Grand Jury that appellants herein mailed out 55,000 circulars. Butcher advised the Grand Jury 'that we felt that the facts in this case were similar enough to those in the *Ginzburg* case to present [the matter to the Grand Jury] *to see if they felt there was probable cause to believe* that a Ginzburg-type situation was present in [the case at bar].' "

■ The appellants failed to recount that the Brochure and the Report were placed into evidence for the Grand Jury. Those materials were sufficient evidence in and of themselves for the Grand Jury to act upon. *Ginbzurg,* supra at 465, 86 S.Ct. 942. Underhill's Criminal Evidence, Fifth Edition, Section 1878.

"[N]either the Fifth Amendment nor any other constitutional provision prescribes the kind of evidence upon which grand juries must act." Costello v. United States, 350 U.S. 359 at 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

Johnson v. United States, 404 F.2d 1069 (9th Cir. 1968) and Wood v. United States, 405 F.2d 423 (9th Cir. 1968), cert. denied, 395 U.S. 912, 89 S.Ct. 1756, 23 L.Ed.2d 224.

■ The record before us is totally lacking of any evidence or showing of any kind that any member of the Grand Jury was biased or prejudiced in any degree against any of the appellants, except only a supposition as to how the members may have reacted upon a view of the Brochure and Report. The presumption of regularity which attaches to Grand Jury proceedings still abides. Vuckson v. United States, 354 F.2d 918 at 921 (9th Cir. 1966), cert. denied, 384 U.S. 991, 86 S.Ct. 1896, 16 L.Ed.2d 1007 and the assignment has no merit.

*Issue 4:*

*Whether appellants were denied due process of law when the trial court refused to grant a short continuance which would have afforded appellants a more representative trial jury, after it was established that young people were systematically excluded from appellants' trial panel and the Clerk was about to correct the said exclusion.*

The record discloses that the Judges of the United States District Court for the Southern District of California had theretofore adopted a duly approved plan for the refilling of the master jury wheel at specified times, pursuant to Title 28 Section 1863(b)(4). The master jury wheel in question was refilled in accordance with that plan in 1968, and the venire now under attack was drawn by lot from that wheel.

It is gleaned from the testimony of the Clerk called by the appellants that the plan requires the drawing of names of persons for prospective jury service from the registered voters of a given area. It follows, therefore, that the youngest person drawn would be in his 21st year of age and that the youngest person on the venire would be in his 24th year. In fact there were a few persons on the venire of that age.

The appellants claim that persons, 18–24 years of age, represent a distinct cognizable class or group. We assume, likened to "religion, . . . national origin, or economic status" as used in

Title 28 U.S.C. Section 1862. In view of the demonstrated fact of ultimately having a most discerning trial jury, the appellants argue, in rather poor taste, that they have "been condemned and branded as felons for having mailed a brochure dealing with sex, by a jury consisting of older persons." They argue that "Since the venire from which appellants' jury was chosen was concededly biased, i. e., young persons were systematically excluded, and since it was established that the young people were more likely to look favorably upon appellants' cause than older persons it was a denial of due process to force appellants to trial before such a jury."

■ While the authorities are in conflict as to whether the "young" do constitute a cognizable group or class, we will assume, without deciding, that they do. Nevertheless, the appellants have failed to show, let alone establish, a purposeful systematic exclusion of the members of that class whose names, but for such systematic exclusion would otherwise be selected for the master jury wheel in accordance with the court's plan. Whitus v. Georgia, 385 U.S. 545 at 551, 87 S.Ct. 643, 17 L.Ed.2d 599 (1966). The court in United States v. Butera, 420 F.2d 564 (1st Cir. 1970), dealt with a similar contention and recognizes that the young 21–34 years of age do constitute a cognizable class. However, the apparent underrepresentation of "the young" in juror pools was justified in view of the transience of young people and their commitments to education and military service. See United States v. Parker, 428 F.2d 488 (9th Cir. 1970) upholding the validity of the jury wheel in question.

The fact of a lower percentage of young persons on the jury than the percentage in the local population in and of itself is not a satisfactory showing of a purposeful exclusion. Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954). The known propensity of younger persons, who are eligible to vote, not to register may well be the self-inflicted exclusion from jury service of which the appellants complain.

■ It thus becomes manifest that the motion for a continuance was without legal grounds, i. e., "to correct the said exclusion." The appellants' hope for a larger percentage of young persons on the next go around does not enjoy constitutional guaranty, nor was the District Court's declination to join in that hope an abuse of judicial discretion in denial of the continuance. Torres v. United States, 270 F.2d 252, at 254 (9th Cir. 1959). We conclude the assignment has no merit.

*Issue 5:*

*Whether appellants were denied due process of law when the trial court refused to ask prospective jurors questions on voir dire designed to expose their biases and prejudices concerning "obscenity" and sex.*

■ We have reviewed the transcript of the District Court's examination on the *voir dire* of the prospective jurors and conclude that the same was full, complete and imminently fair to the appellants as contemplated by Rule 24(a), Federal Rules of Criminal Procedure, and the holdings of this court as late as United States v. Peterson, et al., 9 Cir. 475 F.2d 806 p. 812, 1973. The appellants submitted over 130 separate questions to be placed to the jurors. The District Court asked many of the questions as submitted, many in altered and consolidated form, and declined to ask many others which were cumulative and argumentative. The handling of those questions not asked was clearly within the range of the District Court's discretion in the matter and no clear abuse of the discretion nor prejudice to the appellants has been shown. It is of interest to note that no claim of jury contamination through pretrial publicity, local prejudice, or general attitudes, is asserted here. Accordingly, the appellants' reliance upon Silverthorne v. United States, 400 F.2d 627 (9th Cir. 1968) and the race and religion cases is ill placed. The assignment is without merit.

*Issues 6 and 7:*

*Whether the Brochure at bar is protected by the free speech and press provisions of the First Amendment to the United States Constitution, because it fairly and accurately advertises an important book, entitled to First Amendment protection; and*

*Whether the Government failed to produce the clear and convincing proof constitutionally required to remove presumptively protected publications from the shelter of the First Amendment.*

These two designations interwoven and can be conveniently dealt with together. The appellants argue that since the jury did not find the Report itself obscene, it is protected by the free speech and press provisions and further that since the Brochure is a fair and accurate advertisement (a pictorial story to buy) for a constitutionally protected book it is itself protected by the First Amendment. The premise is false. The jury made no finding on the charged obscenity of the Report. If there be a presumption of the protection of the Report then a query of the bona fides of the Brochure as a protected advertisement is in order. Appellants urge that the right to advertise a book is, of course, an essential link in the whole chain of communications which make freedom of the press a reality. New York Times Co. v. Sullivan, 376 U.S. 254 at 266, 84 S.Ct. 710, 11 L.Ed.2d 686, Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205.

Specifically the appellants cite us United States v. Pellegrino, 467 F.2d 41 (9th Cir. 1972). *Pellegrino* tells us that the advertised book was entitled " 'Woman: Her Sexual Variations and Functions.' It was represented to be over two hundred pages profusely illustrated in a deluxe vinyl edition, selling only by mail order at $14.95.

"It was purportedly edited by a doctor of medicine and was described as 'a complete photo-guide of female sex response.' The advertisement was a brochure in color, folded to provide twelve pages of photographic and printed matter. It contained several explicit color photographs of female genitalia taken from the book itself.[4] These illustrations, however, are not presented as the 'feast-your-eyes-on' type of pornographic entertainment that this court encountered and described in Miller v. United States, 431 F.2d 655 (9th Cir. 1970) . . . Rather they are presented as illustrating various aspects of the book's claimed contributions to general knowledge representing the functions and characteristics of female sexual organs." *Pellegrino* ends with the conclusion that the brochure material was not obscene as a matter of law.

The footnote 4 advises us that "The brochure does not contain portrayals of explicit sexual activity between persons. Compare United States v. Young, 465 F.2d 1096 (9th Cir. 1972) ;" and others.

Unlike the situation in *Pellegrino,* the advertised Report as well as the advertising Brochure are under charge of obscenity. While we are not dealing with the charges against the Report on this appeal it is considered necessary to place it in some context with the Brochure. The Report was developed around the public domain work entitled *The Report of the Commission on Obscenity and Pornography,* an official government document printed by the United States government printing office. The major difference between the *Commission Report* and the Report is the illustrations. The copyright page of the Report contains the following explanation concerning its pictures:

"The Commission *Report* was not illustrated; the publishers have included the illustrative material as examples of the type of subject matter discussed and the type of material shown to persons who were part of the research projects engaged in for the Commission as basis for their *Report.*"

Again, unlike the nature of the *Pellegrino* brochure, the portrayals in the Brochure here are not accompanied by

any text and do not purport to be related to any written material in the report.

We narrate the Brochure as follows:

The Brochure is a single 11 by 14 inch sheet folded once. One side of the outside fold bears a color facsimile of the Report's cover with these printed words:

A GREENLEAF CLASSIC GP555

ADULT READING $12.50
THE
ALL-AMERICAN
COP-OUT

THE
ILLUSTRATED
PRESIDENTIAL
REPORT
OF THE
COMMISSION
ON
OBSCENITY
AND
PORNOGRAPHY

---

Introduction By The American
Civil Liberties Union

Dr. Eason Monroe/Executive Director
for Southern California

---

THE COMPLETE TEXT

---

The other side reads in black type: "THANKS A LOT, MR. PRESIDENT. A monumental work of research and investigation has now become a giant of a book. All the facts, all the statistics, presented in the best possible format . . . and . . . completely illustrated in black and white and full color. Every facet of the most controversial public report ever issued is covered in detail.

This book is a MUST for the research shelves of every library, public or private, seriously concerned with full intellectual freedom and adult selection.

Millions of dollars in public funds were expended to determine the PRECISE TRUTH about eroticism in the United States today, yet every possible attempt to suppress this information was made from the very highest levels.

Even the President dismissed the facts, out of hand. The attempt to suppress this volume is an inexcusable insult directed at every adult in this country. Each individual MUST be allowed to make his own decision; the facts are inescapable. Many adults, MANY OF THEM, will do just that after reading this REPORT. In a truly free society, a book like this wouldn't even be necessary.

---

LIBRARY SERVICE, INC.
P. O. BOX 20308
San Diego, California 92120

The second big printing of this book is now off the press and a major nationwide advertising campaign is underway. The list price is $12.50 per copy, postpaid.

Please return the coupon below, with your remittance, in the enclosed self-addressed envelope.

Please send..... copies. Enclosed is my check or money order in the amount of $......: ($12.50 each).

...................................

I certify, by my signature below, that I am 21 years of age or over and desire the book solely for my private contemplation in the privacy of my home.
SIGNATURE .....................
NAME ............................
(please print)
ADDRESS ........................
CITY ...... STATE ..... ZIP ......"

The folder opens to a full page splash of pictures portraying heterosexual and homosexual intercourse, sodomy and a variety of deviate sexual acts. Specifically, a group picture of nine persons, one male engaged in masturbation, a female masturbating two males, two couples engaged in intercourse in reverse fashion while one female participant engages in fellatio of a male; a second group picture of six persons, two males masturbating, two fellatrices practicing

the act, each bearing a clear depiction of ejaculated seminal fluid on their faces; two persons with the female engaged in the act of fellatio and the male in female masturbation by hand; two separate pictures of males engaged in cunnilinction; a film strip of six frames depicting lesbian love scenes including a cunnilinguist in action and female masturbation with another's hand and a vibrator, and two frames, one depicting a woman mouthing the penis of a horse, and a second poising the same for entrance into her vagina.

The only printed words appearing on this entire interfold of pictures are:

"In the Katzman studies (1970) for the Commission (see page 180), some 90 photographs were rated on five-point scales for 'obscene' and 'sexually stimulating' by the control group. Group activity scenes of the type here illustrated *could have been part of the 90*. (Italics supplied.) Both these group sex pictures are from the Danish magazine Porno Club No. 3, supposedly this was filmed at a 'live show' night club in Copenhagen. There are many similar clubs."

Whatever bona fide advertising attributes the *Pellegrino* brochure may have had the Brochure here has none. It stands alone, with its portrayals of explicit sexual activities between persons, among groups of persons, and a person and beast, as, simply put, hard core pornography under any definition or test. It was for the jury to determine whether the Brochure had any redeeming social value to justify its own position.

"These unusual and startling revelations are of social value (so say the appellants' experts) not only for the bedroom, but necessary as an object lesson for a public forum. The alleged story lines to buy the book (as told by the pictures in the Brochure) are the facade through which clearly shines the (appellants') true and only purpose; that is the presentation of unmistakably hard core pornography . . . the explicit sexual activity represents the 'hard core' feature of the material, while the 'por-nography' and its prurient appeal is distinguished by its pervasive hallucinatory quality, its ability to produce physical concomitants of sexual excitement and emotion . . . . (The Brochure's) dominant theme, and in fact, its only theme is to appeal to prurience in sex. It is hard-core pornography with a vengeance. 'It creates an abstract paradise in which the only emotion is lust and the only event orgasm and the only inhabitants animated phalluses and vulvae.' (Anthony Burgess, speaking of pornography generally . . .)

"It does, in fact, demean and pervert the sexual experience, and insults it, shamelessly, without tenderness and without understanding of its role as a concomitant of the human condition. Therefore, it does dirt on it; it insults sex and the human body as D. H. Lawrence would describe condemnable obscenity (Sex, Literature and Censorship, pp. 69, 74–79 (1953) . . ." Tyler, Judge, writing in People v. Mature Enterprises, Inc., (New York Crim.Ct.), 343 N.Y.S.2d 911 (1973).

We conclude that the appellants' claim that the Brochure is inseparable from the Report is untenable and as such loses any constitutional protection as a legitimate advertisement of an asserted protected book.

The authorities on the necessity or requirement of expert opinion evidence *aliunde* as to obscenity of a charged writing or pictorial communication are in a state of flux. No such expert testimony is necessary. *Young, supra, Ginzburg,* supra; contra, United States v. Klaw, 350 F.2d 155 (2nd Cir. 1965) and United States v. Palladino, 41 LW 1142 (1st Cir. 2/2/73). Nevertheless, the government did present expert opinion testimony in support of the three element requirement of *Roth,* supra, 354 U.S. at 485, 77 S.Ct. 1304, and Memoirs v. Massachusetts, 383 U.S. 413 at 418, 86 S.Ct. 975 at 977, 16 L.Ed.2d 1 (1966), namely:

"(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material

is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

The appellants in argument attack the qualifications of the government's experts and the evidentiary worth of their respective opinions and urge the acceptance of the extensive and voluminous (some 1115 pages in the transcript altogether) opinion testimony of their experts, in many instances flecked with personal interests and ideologies, as binding gospel. Suffice, "The initial question of whether an expert witness has sufficient competency and qualifications to testify is also within the discretion of the trial judge. Fineberg v. United States, 393 F.2d 417, 421 (9th Cir. 1968). Again there is no showing of an abuse by the judge, especially since he properly instructed the jury that it was to consider the expert's credentials and make its own determination as to whether to accept or reject his opinion." United States v. Trice, et al., 476 F.2d 89, 9th Cir., 1973.

We conclude that the assignments 6 and 7 are each without merit.

*Issues 8, 9 and 10:*

*Whether Title 18 U.S.C. Sections 2, 371 and 1461, as construed and applied herein without proof of the essential element of scienter, abridge the exercise of freedoms of speech and press, and other constitutional rights, in violation of the provisions of the First, Fifth, Sixth and Eighth Amendments; and*

*Whether the failure of the indictment herein to allege the essential element of scienter deprived defendants of their liberty without due process of law and failed to inform the defendants of the nature and cause of the accusation made against them, contrary to the provisions of the Fifth and Sixth Amendments; and*

*Whether the constitutional standard for judging scienter in the prosecution under the indictment herein, charging violations of 18 U.S.C. Sections 2, 371 and 1461, required substantial proof beyond a reasonable doubt that each of the defendants was aware of the obscenity of the advertisement, and that with such knowledge mailed and conspired to mail the advertisement, all with the specific intent to appeal to a prurient interest.*

In support of these collected issues the appellants argue the rationale of Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1950), namely: Scienter, as opposed to a statutorily imposed absolute criminal liability, is a necessary and essential element where First Amendment rights are concerned. The appellants would extend this concept to mean that it was necessary for the Grand Jury to find, the indictment to allege and the government to prove to the trial jury,

"not only that appellant knew the contents of the materials mailed, but that he must have had a specific intent to mail what he knew and believed to be obscene literature."

The difficulty with such a premise is that it has received no judicial support to date. The exact premise and approach was rejected in Kahm v. United States, 300 F.2d 78 at 86 (5th Cir. 1962), cert. denied, 369 U.S. 859, 82 S.Ct. 949, 8 L.Ed.2d 18. We regard the following language in United States v. Rubin, 312 F.Supp. 950 (C.D.Cal.1970) as a correct summary of the requirements of scienter in cases of charged obscenity

"Thus it appears that while the rule is clear that some knowledge of the contents of the films is required in the case before us for a successful prosecution under § 1462, the decisions do not precisely define the exact degree or amount of scienter constitutionally required. Mishkin v. New York, 383 U.S. 502, 510–511, 86 S.Ct. 958, 16 L. Ed.2d 56 (1966); and Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). What is certain, however, is that the Government must

prove that the defendant knew the contents of the accused films. Yet the Government does not have the obligation of showing that the defendant knew such contents were in fact legally obscene. The leading case for this is Rosen v. United States, 161 U.S. 29, 16 S.Ct. 434, 40 L.Ed. 606 (1896), which involved a prosecution for mailing obscene material, the Court holding that once material is found to be obscene 'and was deposited in the mail by one who knew or had notice at the time of its contents, the offense is complete, although the defendant himself did not regard the paper as one that the statute forbade to be carried in the mails. Congress did not intend that the question as to the character of the paper should depend upon the opinion or belief of the person who, with knowledge or notice of its contents, assumed the responsibility of putting it in the mails of the United States.' 161 U.S. at 41, 16 S.Ct. at 438. This *Rosen* holding has been adopted in the following recent decisions: United States v. West Coast News Co., 357 F.2d 855, 862 (6th Cir. 1966), rev'd on other *grounds*, Aday v. United States, 388 U.S. 447, 87 S.Ct. 2095, 18 L.Ed.2d 1309 (1967); Kahm v. United States, 300 F.2d 78, 86 (5th Cir. 1962), *cert. denied* 369 U.S. 859, 82 S.Ct. 949, 8 L.Ed.2d 18 (1962); Schindler v. United States, 208 F.2d 289, 290 (9th Cir. 1953), *cert. denied*, 347 U.S. 938, 74 S.Ct. 633, 98 L.Ed. 1088 (1954); and United States v. Luros, 260 F.Supp. 697, 702 (N.D. Iowa, 1966), rev'd on other grounds, 389 F.2d 200 (8th Cir. 1968) . . . ." 312 F.Supp. at 956.

*Roth,* supra, reaffirmed the Supreme Court's 70 year old statement in *Rosen,* supra:

". . . Every one who uses the mails of the United States for carrying papers or publications must take notice of what, in this enlightened age, is meant by decency, purity and chastity in social life, and what must be deemed obscene, lewd, and lascivious." 354 U.S. at 491, Fn. 28, 77 S. Ct. at 1312.

The assignments are each without merit.

*Issue 11:*

*Whether, in the light of the record which is barren of proof that the defendants, or any of them,*

*a) had knowledge of the alleged "obscenity" or of the "nature and character" or the "contents" of the Brochure specified in the indictment,*

*b) mailed or caused to mail the Brochure as charged in the indictment, or*

*c) conspired to mail the advertisement specified in the indictment or had the constitutionally requisite scienter in such alleged conspiracy,*

*the judgments of conviction herein abridge defendants' exercise of freedoms of speech and press, deprive defendants of their liberty without due process of law, deny defendants the equal protection of the laws and the guarantees of a fair trial and hearing, and constitute cruel and unusual punishment, in violation of the provisions of the First, Fifth, Sixth and Eighth Amendments.*

The assignment in each of its parts has no merit.

The trial record, rather than being barren, is fruitful in containing an abundance of clear and convincing evidence directly placing all of the appellants in the play, each acting a separate role, well knowing the contents and substance of the material they in concert caused to be mailed. The government's evidence showed Hamling as the director and producer, Kemp, a writer, and the others the property managers and researchers for the production.

The jury believed the evidence, and the risk referred to by Mr. Justice Holmes in United States v. Wurzbach, 280 U.S. 396, at 399, 50 S.Ct. 167, 74 L. Ed. 508 (1930), is the appellants' sufferance.

*Issue 12:*

*Whether the wholesale exclusion of constitutionally relevant evidence proffered by defendants deprived the defendants of a fair hearing and fair trial, an opportunity to be heard and to defend against the charges, with resultant deprivation of defendants' liberty, contrary to the free speech and press, due process and fair trial provisions of the First, Fifth and Sixth Amendments.*

The appellants offered in evidence various written and pictorial matters and one reel of motion picture film, which the appellants claim were comparables to portrayals in the charged Brochure, in order to show non-obscenity of the charged material. It is asserted some of the proffered material was relevant because they had received second-class mailing privileges, others because they had been the subject of litigation and had been found to be "constitutionally protected," and others because they were currently available on newsstands.

■ We have perused the record and viewed the rejected pieces and conclude the District Court was right in rejecting the proffered exhibits.

The proffered materials, in and of themselves, were devoid of relevancy. One portrayal of female genitalia is quite likely to be comparable to another, and one portrayal of the act of fellatio is quite likely to be comparable to another, and so on. Nevertheless, none of the proffered pieces, speaking for themselves, tell the jury about the nature or context of their respective communications as viewed under the three-prong Roth-Memoirs test of obscenity. Nor was any offer of proof in that regard made. Accordingly, the jury had no basis to determine comparability of a given proffered portrayal with any portrayal in the Brochure as it was communicated under the facts of this case, nor for the weight to be given to such comparability, if any there be, Womack v. United States, 111 U.S.App.D.C. 8, 294 F.2d 204 (1961), cert. denied 365 U.S. 859, 81 S.Ct. 826, 5 L.Ed.2d 822 (1961); United States v. Jacobs, 433 F.2d 932 (9th Cir. 1970).

For an example, we mention the Pellegrino portrayals of female genitalia being stimulated with a vibrator. These pictures were judicially held to be non-obscene, yet in and of themselves, they are most likely pure hard core pornography. They become non-obscene when communicated in the context of a pictorial adjunct to educational text. It was through this measure and consideration the pictures acquired some social value. The proffered pieces had no logical or reasonable social value attributed to them for the jury to consider in determining the obscenity or non-obscenity of the charged Brochure.

■ A second-class mailing privilege is not a license to mail obscene material. Hannegan v. Esquire, 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586 (1946). Just because pictures, which might be look-a-likes to the pictures in the Brochure, are for sale and purchased in book stores around the country does not make them witnesses of virtue. United States v. Manarite, 448 F.2d 583 (2nd Cir. 1971), cert. denied, 404 U.S. 947, 92 S.Ct. 281, 30 L.Ed.2d 264 (1971).

The District Court rejected the proffered pieces primarily because "they tend to confuse the jury." The admissibility of such evidence is within the discretion of the trial court. Schindler v. United States, 208 F.2d 289 (9th Cir. 1953), cert. denied, 347 U.S. 938, 74 S.Ct. 633, 98 L.Ed. 1088 (1953); *Jacobs,* supra.

Any abuse to appellants' defense in the rejection of the confusing exhibits was removed and cured by the District Court's offer to entertain expert testimony with respect to the elements to be shown for the advice of the jury. We conclude the assignment lacks merit.

*Issues 13 and 14:*

*Whether the trial court erred in permitting the Government to introduce evidence that the Brochure appealed to the*

*prurient interest of sexually deviant groups, and in instructing the jury that it could convict if it found that the Brochure appealed to the prurient interest of undefined sexually deviant groups, although neither the statute nor the indictment fairly advised appellants that they were so charged, and the record was barren of evidence that the Brochure was designed for and primarily distributed to sexually deviant groups; and*

*Whether the appellants were unfairly convicted in violation of due process of law and in violation of Rule 7(f) of the Federal Rules of Criminal Procedure, when the court instructed the jury that it could measure the prurient appeal of the Brochure by its impact on undefined sexually deviant groups, after the Government filed a Bill of Particulars stating that its claim was that the Brochure appealed to the prurient interest of the average person.*

 These two issues are interlocked and as such should be discussed together. The appellants are correct. They were charged with dealing in obscene materials which appealed to the prurient interests of the *average person*. The government so stated in its pre-trial answer to the appellants' request for particulars. The cause was tried on that premise, and when the District Court's instructions are taken as a whole we conclude the jury was so instructed and the assignments are each without merit.

Dr. Anchell did give opinion testimony over the objection of the appellants that the material appealed to the prurient interests of homosexuals, group sexual activists and persons in masochism, pedophilia and zoophilia. However, this testimony was directed to the charged report, and the sole direct testimony concerning the Brochure was that it had an appeal to "pruriency."

The District Court's instructions made it abundantly clear to the jury that in order to convict any of the appellants

they must find the coalescence of the Roth-Memoirs three elements, namely:

"(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex;

(b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and

(c) the material is utterly without redeeming social value."

The jury was further advised:

"Now, what is prurience? . . . Prurient interest is a shameful or morbid interest in sex or nudity, and you must measure this appeal *by the average or ordinary adult or by a clearly defined deviant group, as will be explained elsewhere.* (Emphasis added) . . .

"In determining whether material appeals to a prurient interest, you should consider not only what is portrayed, but the way it is portrayed, and the way it is used, or the way it is described. The materials here involved must be measured by its appeal to *the average adult* . . . determined by the synthesis of the entire community, including persons of all sexes, religions, . . . ages and et cetera . . . but . . . it must be remembered that the materials must be measured *by such average adult* and not by young persons or those persons highly susceptible thereto."

When the foregoing pertinent parts of the instructions are considered together it is manifest that the District Court considered that some of the portrayals in the Brochure might be found to have a prurient appeal to homosexuals, i.e., male practicing fellatio, and not to the average person. Hence, we believe, to avoid confusion the jury was advised, that

"the prurient interest requirement may, also, be assessed in terms of sexual interests of the intended or proba-

ble recipient group . . . (which) must be a clearly defined sexually deviant group . . . I suppose one clearly defined would be homosexuals. "There are depicted throughout the materials under consideration, various sexual activities that may or may not be found to be deviant, that may have prurient appeal, depending upon the particular sexual interest of the viewer, whether normal or deviant. . . .

"Consequently, if you find that some of the material appeals to the prurient interest of the average person, and some of the material appeals to the prurient interest of a deviant sexual group, that fact would not preclude your finding that the dominant theme of the material taken as a whole is, generally speaking, one of an appeal to the prurient interest, as has been previously defined in the broad sense."

The instructions on the prurient appeal to deviant groups was cautionary and did not comprise nor mitigate the repeated admonition of the District Court that the jury must find the *dominant theme* of the material to be one of prurient *appeal to the average person*. While we do not hold that the opinion testimony of Dr. Anchell constituted a variance of proof under the government's answer we will assume that it did. However, such variance was in no wise a surprise or prejudice to the defendants as their own expert opinion testimony interwove and covered the same field completely.

*Issue 15*

*Whether the trial court erred in instructing the jury that the Brochure could be condemned as obscene, even if it did not meet the three-pronged test of obscenity, if the jury found "pandering,":*

*a) where pandering is not encompassed in 18 U.S.C. Section 1461, and*

*b) where pandering is encompassed in other legislation enacted by Congress, 39 U.S.C. Section 3008, and*

*c) where pandering was not charged in the indictment, and*

*d) where there was no evidence in the record of pandering.*

The premise of this designation is vitiated with a perusal of that part of the District Court's instructions dealing with the evidentiary value of the practice of pandering, if there was such, in considering whether the charge of obscenity was sustained. The jury was advised:

"Having covered the three elements of obscenity, there is one additional matter that you may consider and that is the matter of pandering. You must make the decision whether the materials are obscene under the test I have given you. In making this determination you are not limited to the materials themselves. In addition, you may consider the setting in which they were presented. Examples of what you may consider in this regard are such things as: Manner of distribution, circumstances of production, sale, and advertising. The editorial intent is also relevant. What you are determining here is whether the materials were produced and sold as stock in trade of the business of pandering. Pandering is the business of purveying textual or graphic matter openly advertised to appeal to erotic interest of the customer . . .

"The question of obscenity is to be answered by application of the basic test recited earlier, but if you find this to be a close case under that test, then you may consider the evidence of pandering to assist you in your decision. Such evidence is pertinent to all three elements of the basic test of obscenity.

"The circumstances of presentation and dissemination of material are especially relevant to a determination of whether the social importance claimed for the material is pretense or reality, whether it was the basis upon which it was traded in the market place or a spurious claim for litigation purposes. Where the distributors' sole emphasis

is on the sexually provocative aspects of the publications, that fact may be decisive in the determination of obscenity . . .

"In summary, evidence of pandering simply is useful in applying the basic obscenity test where an exploitation of interest in titillation by pornography is shown with respect to the material lending itself to such exploitation through pervasive treatment or description of sexual matters. Such evidence may support the determination that the material is obscene, even though, in other context, the material would escape such condemnation."

We must keep in mind that the jury was being instructed in consideration of the charges against both the Report and the Brochure. At that stage the Brochure was being considered as (a) a document charged as obscene in and of itself and (b) an advertisement of the Report, an alleged obscene book.

■ We conclude the instruction was correct as applied to the Brochure in either classification. This court in considering the practice of pandering as it applied to the *Pellegrino* brochure stated:

"We cannot say, however, that the question of pandering is wholly irrelevant. Pandering advertising may well forfeit an otherwise available claim of redeeming social value. Further it may cast light on the question whether the dominant theme of the advertising brochure itself is an appeal to a prurient interest in sex."

*Issue 16:*

*Whether the refusal of the trial court to give defendants' proposed instructions on scienter, and the trial court's instructions on scienter, abridged defendants' exercise of freedoms of speech and press, and other constitutional rights, contrary to the First, Fifth and Sixth Amendments.*

■ A perusal of the appellants' proposed instructions shows them to be partisan presentation of the legal issues raised in their arguments and position dealt with under Issues 8, 9 and 10 and were properly rejected. The District Court's instructions to the jury on scienter were in conformity with the legal requirements of scienter outlined above. We see no merit to the assignment.

*Issue 17:*

*Whether the trial court committed clear, and reversible, error when it denied appellants the opportunity to make objection to the court's jury charge out of the presence of the jury.*

The appellants urge that they were entitled as of right under Rule 30, Federal Rules of Criminal Procedure, to make and enter their objections to the jury charge not only out of the hearing, but also "out of the presence of the jury" and the denial thereof was clear reversible error.

Such appears to be the rule of Hall v. United States, 378 F.2d 349 (10th Cir. 1967); however, the question raised by the assignment is one of first instance and undecided in this circuit. We believe, in order to properly resolve that question, it is necessary to consider the pertinent provisions of Rule 30 in four aspects or parts. These are:

1) At the close of the evidence or . . . earlier time . . . as the court . . . directs, any party may file written requests . . . (requested instructions).

2) The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, . . . (settlement of instructions conference).

3) No party may assign as an error any portion of the charge or omission therefrom unless he objects thereto before the jury retires . . . (record of objections).

4) Opportunity shall be given to make the objections out of the hearing of the jury and, on request of any party, *out of the presence of the jury.* (After instructing conference.)

While hindsight is very good at telling us that compliance with the rule would have been the right thing to do, it does not answer the question in this case. The rule of *Hall,* supra, would declare the District Court's denial of appellants' request an automatic reversible error, even though the after instructing conference was in fact a mere perfunctory saving of record. Other circuits dealing with the question have adopted one of two alternate approaches:

a) The court's refusal to comply with the fourth aspect of Rule 30 "will demand reversal 'if there is reasonable basis for concluding that the colloquy held in the presence of the jury was prejudicial.'" United States v. Fernandez, 456 F.2d 638 at 644 (2nd Cir. 1972). This rule appears to abide also in the 5th Circuit.

b) The court's failure to comply with the fourth aspect of Rule 30 is reversible "error unless it be demonstrated on an examination of the whole record that the denial of the right did not prejudice" a defendant's case. United States v. Schartner, 426 F.2d 470 at 479–480 (3rd Cir. 1970). This rule also appears to be the rule in the 4th Circuit.

We believe the automatic reversal rule of *Hall,* supra, is too uncompromising in its harshness and decline to adopt the same.

It is manifest that the rule of *Fernandez,* supra, places a burden upon a defendant in a criminal case that he may not be able to carry.

Occasionally procedural errors do occur during the course of a given trial and yet are of no consequence whatsoever to a fair and just outcome. The fair and just outcome and ultimate justice is fostered by a rule which treats inconsequential procedural errors as such, and still provides for relief from those procedural errors that do result in a party's prejudice and an unjust outcome.

We believe that the principle announced in *Schartner* leaves more room for looking at the facts and the circumstances leading up to and attending the after instructing conference for a realistic basis of concluding that such conference was not prejudicial and we subscribe to the rule of *Schartner.*

Viewing the whole record in this case it becomes manifestly clear that at the time the District Court invited counsel to the bench it was the intention of the court, and should have been on the part of all counsel as well, that the after instructing conference at the bench was to be a perfunctory record saving session.

In conformity with the settling of instruction conference phase of Rule 30 the District Court and counsel held an extensive and exhaustive conference by way of reviewing the requests and settling the instructions to be given by the District Court and noting counsel's objections thereto. We burden this opinion no more than to recite the closing phases of that conference:

"MR. KATZ: (for some of the appellants) May I just say one thing, your Honor. I know that the Court has in the past assumed that we join in all objections. Since Rule 30 requires that at the close of the instructions we make our objections, I would like the record to show that we are joining Mr. Fleishman in the objections and we assume that at the conclusion of the Court's instructions, *the Court will incorporate all objections made at this time as though the conference had been held after the instructions were given.*

THE COURT: That is correct.

MR. KATZ: Thank you.

THE COURT: All right.

MR. FLEISHMAN: (for the other appellants) That applies also with regard to the conspiracy instructions which I did not apply myself to specifically. I believe the conspiracy instructions given by the Court are violative of the constitutional rights of

the defendants and that our instructions on conspiracy, particularly as they apply to the First Amendment, to the expression of books and magazines, all of which were excluded by the Court's proposed instructions on conspiracy—we object to those and we object to the failure of the Court to give our instructions in that regard.

THE COURT: All right."

and the opening of the after instructions conference at the bench:

"THE COURT: . . . Now, for the purpose of the record, Mr. Fleishman, your objections—all of your objections to the instructions have heretofore been noted and I said that I would give note to the fact before I concluded the instructions.

Do you have any comments to make?

MR. FLEISHMAN: Yes, your Honor. I think the matter is at this stage very sensitive with the Jury here. I would suggest it wouldn't take long, perhaps not more than four or five minutes, but I would urge the Court to ask the Jury to go into the jury room while we present it.

I gather that sometimes words drift over to the Jury at this stage of the proceedings.

THE COURT: You have made all the objections suitable that I can think of. I want to send this Jury out. If you want to make a statement, make a statement.

MR. FLEISHMAN: I would ask the Court if it is convenient, that they be excused for a few moments.

THE COURT: No.

MR. FLEISHMAN: First of all, with regard to the social value, Your Honor referred to the book and magazine rather than the book and advertise-

ment. I think that has to be corrected. You said book and magazine, the social value test applies. I know it was a mistake in reading. At least, that is what I heard. I think that ought to be corrected.

THE COURT: All right."

Thereafter, Mr. Fleishman continued for ten pages of transcript reiteration of the appellants' position taken at the settlement of instructions conference. Mr. Katz had only this to say:

"Now, just so it is clear, my clients joined in the objections Mr. Fleishman has made and all of the objections made at the previous conference are incorporated. . . ."

Whatever reaction the jury might have had from seeing or hearing any part of the bench conference was the result of counsel's own doings and unnecessary for the preservation of appellants' record of objections. We conclude there was no prejudice to any of the defendants as a result of the procedural error on the part of the District Court to literally comply with Rule 30.

Following the bench sessions, the District Court called the jury's attention to and corrected the slip of the tongue reference to a "magazine."

*Issue 18:*

*Whether, in the light of all the foregoing, the trial court erred in denying defendants' post-trial motions for judgment of acquittal, in arrest of judgment, and for a new trial.*

Since we have dealt with all of the grounds for each of the foregoing motions adversely to the appellants, the above assignment is meritless.

The judgment of convictions is affirmed.